Scheffey with FNs 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-96-00216-CV







Texas State Board of Medical Examiners, Appellant




v.




Eric Heston Scheffey, M.D., Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT


NO. 95-08507, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING







 The State Board of Medical Examiners suspended Eric Heston Scheffey's license to
practice medicine. Scheffey sought judicial review of the Board's order in district court. The district court
reversed the Board's order, holding that the decision to suspend the license was not supported by
substantial evidence. The Board appealed to this Court. We will reverse the trial court's judgment.


BACKGROUND


 In a formal complaint, the Board charged Scheffey with three violations of the Medical
Practice Act. See Tex. Rev. Civ. Stat. Ann. art. 4495b (West Supp. 1997) (the "Act"). The complaint
charged Scheffey with: (1) deviations from the minimum acceptable standard of care; (2) flagrant and
persistent overcharging; and (3) flagrant and persistent overtreatment. The Board's complaint stated that
these violations of the Act were grounds for cancellation, revocation, or suspension of Scheffey's license
to practice medicine pursuant to section 4.01 of the Act. See Act § 4.01.

 An administrative law judge ("ALJ") conducted an administrative hearing and submitted
a proposal for decision and a proposed order to the Board recommending revocation of Scheffey's medical
license. The full Board then considered Scheffey's case and declined to accept the ALJ's recommendation
to revoke Scheffey's license. Instead, the Board adopted the ALJ's findings of fact and suspended
Scheffey's license but stayed the suspension and placed him on probation for five years subject to certain
conditions.

 The district court reversed the Board's decision, concluding that there was not substantial
evidence to support the Board's action. The Board appealed to this Court in a single point of error, arguing
that its order was supported by substantial evidence.


EVIDENCE PRESENTED AT THE HEARING


 Multiple witnesses testified at the Board's hearing, focusing on four of Scheffey's medical
patients. Because the issue before this Court concerns whether substantial evidence supports the Board's
decision to suspend his license, we will briefly discuss the evidence surrounding each case.


Patient D.G.

 Following a wrist injury, D.G. was treated by Scheffey and other doctors and he was
administered various diagnostic tests. (1) Several doctors, including Dr. Scheffey, concluded that D.G. had
mild carpal tunnel syndrome ("CTS"). The experts disagreed, however, as to whether the test results
indicated a carpal tunnel release was required. Scheffey performed this surgical procedure on D.G.

 At the hearing before the Board, Dr. Flatt testified that the only tests supporting a diagnosis
of CTS were the Tinel's test and Phalen's test and that they were not sufficient evidence on which to make
an affirmative diagnosis. He believed the nerve conduction study showed normal results; however, he
conceded that each doctor could interpret the results differently. Dr. Flatt testified that the nerve
conduction study showed, at most, only mild CTS and revealed improvement from the use of a wrist splint. 
He supported his assertion with the negative Electromyographic Examination ("EMG") performed in
December 1988. Additionally, Scheffey's records do not indicate that he administered any other tests on
D.G., and he did not review the EMGs, one of which specifically stated that it would not support a
diagnosis of CTS. Dr. Flatt stated that Scheffey's diagnosis of CTS was not medically indicated based on
Scheffey's records, D.G.'s complaints, the physical findings, and the EMG and nerve conduction studies. 
He, therefore, concluded that the carpal tunnel surgery was not medically indicated and was not based on
a solid diagnosis.

 Scheffey's records reflect that D.G.'s surgery lasted twenty minutes, but Drs. Cameron,
Crouch and Flatt testified that in that period of time, Scheffey could not possibly perform all the procedures
he listed in the operative report. All three doctors agreed that a carpal tunnel release could take about
twenty minutes to perform; however, the additional procedures allegedly performed should have added at
least one hour. The doctors also took issue with various elements of the surgery, including necessary
instruments which were not mentioned in the surgical report, unnecessary procedures, and findings that
were not supported by the medical history and records.

 Finally, Dr. Cameron and Dr. Crouch testified about Scheffey's charges. Both testified that
Scheffey inappropriately charged D.G. for an initial consultation after she had been his patient for several
months and that Scheffey's fees were excessive. Dr. Crouch testified that Scheffey engaged in
"unbundling" (2) in his billing for D.G.'s carpal tunnel release. Scheffey and his office manager, Susan Towne,
testified that there were no guidelines for global fees, and Towne additionally testified that the itemization
of surgical procedures and charges was an acceptable practice for the filing of insurance claims. Dr.
Cameron agreed that this practice is common, but maintained that Scheffey had excessively billed and that
the overcharging amounted to dishonorable conduct.


Patient G.M.

 G.M. was treated by Scheffey for neck and back pain which radiated into his legs. 
Scheffey prescribed physical therapy and performed several diagnostic tests. (3) Scheffey's impression after
the first set of diagnostic tests was that G.M. had a herniated lumbar disc and a cervical sprain with a
bulging disc. Scheffey admitted G.M. to the hospital for additional tests (4) and then performed back surgery
on G.M.

 G.M.'s condition improved after the surgery, but he subsequently experienced pain again. 
G.M. continued to seek treatment from Scheffey and underwent additional testing. Scheffey performed
a second surgery on G.M.,after which G.M. continued to complain of pain and soreness across his back. 
At office visits after the second surgery, Scheffey continued to order diagnostic tests and routinely took X-rays of G.M.'s lumbar spine.

 The Board determined that Scheffey overtreated G.M. by performing surgery when it was
not medically indicated. Dr. Sanders testified that a case could be made for performing the first surgery
on G.M. However, he questioned Scheffey's decision to operate when G.M. had unexplained pain. Dr.
Sanders opined that Scheffey should have obtained psychological studies before the first surgery. He
testified that the second surgery was medically indicated but that the fusion performed in the second surgery
should have been performed in the first surgery. Dr. Sanders also criticized Scheffey's choice of diagnostic
testing after the first surgery and believed that an MRI would have been the most helpful test. Dr. Cameron
supported Scheffey's assertion that an MRI was not possible on G.M. Additionally, at least one MRI was
performed on G.M. when it became possible.

 Dr. Cameron and Dr. Sanders testified regarding Scheffey's overcharging for the services
provided to G.M. They testified that Scheffey billed for a comprehensive history and physical that was
unnecessary and for intermediate follow-up office visits that should have been simple check-up reviews. 
Additionally, Dr. Mulloy, who testified on Scheffey's behalf, agreed that Scheffey should not have charged
for reading three reports interpreting lumbar myelograms. Both Dr. Cameron and Dr. Sanders testified that
various procedures during both surgeries were either superfluous or unnecessary charges or were simply
unjustified. Additionally, both stated that aspects of G.M.'s follow-up care should have been included in
the global fees for the surgeries. Overall, the doctors set forth multiple examples of unnecessary charges,
unjustifiable charges, and excessive diagnostic testing. (5)


Patient S.R.

 S.R. was treated by Scheffey for back and leg pain. After multiple diagnostic tests were
performed, (6) Scheffey performed back surgery on S.R. Drs. Hall, Sanders, and Cameron reviewed S.R.'s
case; all three agreed that there were inadequate indications for surgery. They pointed to multiple
diagnostic tests that produced normal or negative results and stated that other test results did not provide
a definitive diagnosis and were "weak" bases upon which to perform surgery. Dr. Sanders and Dr. Hall
also asserted that the highly sensitive post-myelogram CT would have revealed a need for surgery. Dr.
Sanders stated that with the normal studies, S.R. did not exhibit enough medical indications to benefit from
surgery and pointed out that Scheffey never made a definitive diagnosis until the day of the surgery. Dr.
Hall and Dr. Sanders also testified that aspects of Scheffey's operative report were inconsistent with the
diagnostic studies.

 Regarding Scheffey's charges, Dr. Cameron testified that Scheffey's initial comprehensive
consultations were unjustified because an initial comprehensive examination was performed at S.R.'s first
visit. He criticized Scheffey for twice billing S.R. for interpreting a lumbar discography when a radiologist
performed the interpretation. Dr. Cameron testified that Scheffey miscoded and overcharged for the
procedures during S.R.'s surgery, and while Ms. Towne, Scheffey's office manager, opined that the use
of the particular code was a mistake, she did not have personal knowledge of any mistake, and no member
of Scheffey's staff ever corrected the mistake. Finally, Dr. Cameron stated that Scheffey's charge for
S.R.'s surgery was excessive and not the usual and customary charge.


Patient D.M.

 D.M., a forty-two-year-old woman, sought treatment from Scheffey for a back and hip
injury. Scheffey ordered multiple diagnostic tests before he performed surgery. (7) Scheffey's preoperative
diagnosis was that D.M. suffered from a herniated nucleus pulposus and a bulging disc and that
conservative treatment had failed. Scheffey performed back surgery at two levels. 

 At the hearing, Dr. Hall and Dr. Cameron testified that Scheffey did not have sufficient
objective evidence to perform surgery on D.M. Both believed that the post-myelogram CT scan revealing
a slight bulge was a flimsy basis for surgery. Dr. Cameron also noted that most forty-to fifty-year-old
persons will have some slight bulging with no symptoms. The doctors discredited the abnormal finding after
the second discogram; Dr. Cameron agreed with Dr. Hall that the test was normal and stated that the only
thing abnormal about the test was D.M.'s pain.  Dr. Cameron additionally stated that nothing in the imaging
tests demonstrated nerve root damage, and although there were some clinical indications of damage, they
were not confirmed. He also expressed that the EMG's suggestion of radiculopathy was "very weak."

 Dr. Cameron testified about Scheffey's charges for D.M.'s treatment. He testified that
Scheffey's charges for interpreting the lumbar myelogram and for three initial comprehensive consultations
were unjustified because the radiologist interpreted the myelogram and because a comprehensive
consultation was performed when Scheffey first examined D.M. Dr. Cameron also found fault with
Scheffey's coding and billing for procedures which were more complicated and expensive than the
procedures actually performed. Ms. Towne testified that she believed the coding was a mistake; however,
no attempt was made to correct the errors. Dr. Cameron testified that Scheffey's charges for the surgery
were in excess of the usual and customary charges in the area and that Scheffey billed separately and
additionally for procedures and follow-up visits that should have been included in the overall charge for the
surgery.

 Dr. Hall concluded that Scheffey performed surgery on D.M. without symptoms and
physical findings to support the action. Dr. Cameron concluded that Scheffey over treated D.M. by
performing unwarranted surgery, repeated his practice of unjustified charges, and improperly coded for
procedures which yielded a higher rate of reimbursement.


DISCUSSION


 In reviewing the administrative decision of the Board, we use the substantial evidence scope
of review defined under the Administrative Procedure Act. See Tex. Gov't Code Ann. § 2001.174(2)(E)
(West 1997) (the "APA"). We must first consider whether the evidence as a whole is such that reasonable
minds could have reached the same conclusion as the agency. See Texas State Bd. of Dental Examiners
v. Sizemore, 759 S.W.2d 114, 116 (Tex. 1988), cert. denied, 490 U.S. 1080 (1989); Wilmer-Hutchins
Indep. Sch. Dist. v. Brown, 912 S.W.2d 848, 852 (Tex. App.--Austin 1995, writ denied). We may not
substitute our judgment for that of the agency as to the weight of the evidence. Public Util. Comm'n v.
Gulf States Util. Co., 809 S.W.2d 201, 211 (Tex. 1991); see also APA § 2001.174. Decisions of an
administrative agency are presumed to be supported by substantial evidence, and the burden is on the
contestant to prove otherwise. Texas Health Facilities Comm'n v. Charter Medical, 665 S.W.2d 446,
453 (Tex. 1984). If substantial evidence supports the Board's findings, we must resolve all conflicts in
favor of the Board's decision, see Wilmer-Hutchins, 912 S.W.2d at 852, and uphold the Board's action
if the evidence is such that reasonable minds could have reached the conclusion the Board must have
reached in order to justify the suspension. See Charter Medical, 665 S.W.2d at 453.

 Based upon its findings of fact, the Board concluded as follows:


* * *



(5) Based on Findings of Fact Nos. 15-335, Respondent has violated § 3.08(4)(G) of the
Act in that he persistently and flagrantly overcharged or overtreated patients.


(6) Based on Findings of Fact Nos. 15-335 and Conclusion of Law No. 5, Respondent
has engaged in dishonorable or unprofessional conduct that is likely to deceive or
defraud the public or injure the public, a violation of § 3.08(4) of the Act.


(7) Based on Findings of Fact Nos. 15-335, Respondent has failed to practice medicine
in an acceptable manner consistent with the public health and welfare, a violation of §
3.08(18) of the Act.


(8) Pursuant to § 4.01 of the Act, the Board has the authority to cancel, revoke, or
suspend the license of any practitioner of medicine or impose any other authorized
means of discipline upon proof of the violation of the Act in any respect.


(9) Based on the Findings of Fact and Conclusions of Law Nos. 5-8, any one of the
violations is grounds for revocation or disciplinary action by the Board.



As the Board noted, any one of these violations would provide grounds for suspending Scheffey's license. 
See Act § 4.01(a); Guerrero-Ramirez v. Texas Bd. of Medical Examiners, 867 S.W.2d 911, 918 (Tex.
App.--Austin 1993, no writ). This Court need only find substantial evidence supporting one ground for
suspension in order to uphold the Board's order even if all three bases given by the Board are
independently sufficient to support the suspension. See Act § 4.01(a); Guerrero-Ramirez, 867 S.W.2d
at 918.

 The first two bases for suspension of Scheffey's license related to his charging practices. 
In conclusion of law five, the Board determined that Scheffey violated the Act by flagrantly and persistently
overcharging or overtreating his patients. In conclusion of law six, the Board determined that he had
engaged in dishonorable or unprofessional conduct that was likely to deceive or defraud the public or injure
the public, basing this violation upon the overcharging. See Act § 3.08(4). Even assuming that Scheffey
overcharged his patients, to uphold the Board's decision, we must also determine that his overcharging was
either flagrant or persistent.

 The statute does not define what constitutes "persistently or flagrantly overcharging." Id.
at 338; see also Act § 3.08(4)(G). This Court addressed the issue of persistent and flagrant overcharging
in Texas Bd. of Medical Examiners v. Birenbaum, 891 S.W.2d 333 (Tex. App.--Austin 1995, writ
denied), and defined "flagrant" as "extremely, flauntingly, or purposefully conspicuous; glaringly evident;
notorious." We defined "persistent" as "continuing in a course of action without regard to opposition or
previous failure; tenacious of position or purpose; existing for a long or longer than usual time or
continuously." Birenbaum, 891 S.W.2d at 338. We must, therefore, ascertain whether Scheffey's
charges were either (1) so excessive as to amount to extremely conspicuous or glaringly evident
overcharging or (2) occurred so repetitively as to be tenacious or continuous. Id.

 Even assuming the record contains substantial evidence that Scheffey flagrantly
overcharged, we must also determine whether Scheffey "persistently overcharged." Such a determination
requires a thorough examination of Scheffey's charges across the whole spectrum of his patients. Id. at
340. In Birenbaum, we determined that focusing on only seven complicated cases, while Birenbaum's
practice included more than three hundred seventy-five patients, did not demonstrate "persistent"
overcharging. Id. In this case, Scheffey's practice included 4500 patients; however, the Board focused
on only four cases. Under the general definition of the term "persistent," this record does not contain
substantial evidence to support the Board's finding that Scheffey persistently overcharged. Examining the
evidence in the record, we agree with the district court that the record does not contain substantial evidence
to support the Board's finding of persistent overcharging. Having determined that there is not substantial
evidence to support a determination of persistent overcharging, it may not be said that the Board's findings
of fact support conclusion of law five. (8)

 In conclusion of law six, the Board determined that Scheffey engaged in dishonorable or
unprofessional conduct that was likely to deceive or defraud the public or injure the public. See Act §
3.08(4). Flagrant or persistent overcharging under section 3.08(4)(G) is one method by which section
3.08(4) may be violated, and the Board expressly based conclusion of law six upon conclusion of law five. 
See id. § 3.08(4), .08(4)(G). Our determination that there is not substantial evidence to support conclusion
of law five, therefore, necessitates the same result regarding conclusion of law six.

 Scheffey insists that the Board's order must fail because conclusions of law five and six are
not supported by substantial evidence. However, we need only find substantial evidence supporting one
ground for suspension in order to uphold the Board's order, especially in light of conclusion of law nine in
which the Board expressly concluded that "any one of the violations is grounds for revocation or
disciplinary action by the Board." See Act § 4.01(a); Guerrero-Ramirez, 867 S.W.2d at 918.

 The Board's order stated a third basis for suspending Scheffey's license, focusing on
Scheffey's treatment of patients rather than his charging of fees. In conclusion of law seven, the Board
determined that Scheffey violated section 3.08(18) of the Act by failing to practice medicine in an
acceptable manner consistent with the public health and welfare. See Act § 3.08(18). The Board heard
testimony from Drs. Flatt, Hall, Cameron, and Sanders regarding Scheffey's operations on the four patients
when surgery was not medically indicated. In each case, the experts noted that multiple diagnostic tests
were performed but they gave only minimal, if any, indications for the procedures performed. Additionally,
the doctors discredited the findings of several of the tests due to the possibility of varying interpretations.

 While Scheffey presented experts who testified that the surgeries were medically indicated,
if substantial evidence supports the Board's findings, we must uphold the Board's decision and resolve any
conflicts in favor of the agency decision. See Auto Convoy v. Railroad Comm'n, 507 S.W.2d 718, 722
(Tex. 1974); Wilmer-Hutchins, 912 S.W.2d at 852. The question of what meaning, weight, and credibility
to assign the conflicting evidence was a matter for the Board to determine; we are forbidden to make those
assessments and are limited to the issue of whether the agency record as a whole demonstrates that the
Board's assessments were reasonable. See APA § 2001.174(2); Auto Convoy, 507 S.W.2d at 722.

 After hearing and weighing the testimony regarding the necessity of the surgeries performed
by Scheffey, the Board determined that Scheffey failed to practice medicine in an acceptable manner
consistent with the public health and welfare. We conclude that reasonable minds could have reached the
conclusion that Scheffey overtreated his patients by performing surgery when surgery was not medically
indicated and that there is sufficient evidence to support the Board's determination that Scheffey failed to
practice medicine in an acceptable manner consistent with the public health and welfare. See Sizemore,
759 S.W.2d at 116; Wilmer-Hutchins, 912 S.W.2d at 852. Accordingly, we conclude that there was
substantial evidence to support the Board's conclusion that Scheffey violated section 3.08(18) of the Act.


CONCLUSION


 Because we need only find substantial evidence supporting one ground for suspension in
order to uphold the Board's order, we hold the record contains substantial evidence to support the Board's
conclusion that Scheffey violated section 3.08(18) of the Act by failing to practice medicine in an
acceptable manner consistent with the public health and welfare by performing surgery when it was not
medically indicated. Based upon this violation, the Board could suspend Scheffey's license. Thus, we
sustain the Board's point of error, reverse the judgment of the district court, and render judgment reinstating
the decision of the Board.



 Marilyn Aboussie, Justice

Before Justices Powers, Aboussie and Jones

Reversed and Rendered

Filed: July 3, 1997

Publish

1. The diagnostic tests performed and the results obtained were: 



 Nerve conduction study showing mild CTS
 Tinel's test showing possible CTS
 Phalen's test showing positive CTS
 Nerve conduction velocity study did not support CTS diagnosis
 Electromyographic Examination ("EMG") did not show CTS, but showed possible
radiculopathy. 
2. "Unbundling" occurs when a doctor charges for individual elements of a procedure that should be
included in the charge for the overall procedure. 
3. G.M. initially underwent the following tests:


 Three-dimensional CT of the lumbar spine showing minimal narrowing at the L5-S1 interspace
and moderate narrowing at the L5-S1 neural foramina bilaterally 


 

 MRI of the cervical spine showing degenerative changes
 MRI of the lumbar spine showing mild degenerative changes with a mild generalized bulging
annulus at L4-L5 and a transitional L5 vertebra
 CT of the lumbar spine showing a probable disc herniation at L4-L5 and prominent central
bulging calcification at L5-S1 
4. The following tests were performed in the hospital:

 Myelogram with normal results except for the transitional L5 vertebra and mild degenerative
changes 
 Post-myelogram CT scan suggested a midline posterior L4-L5 disc herniation. The herniation
was not, however, substantiated on the myelogram. 
 Electrical nerve studies suggesting lumbar fifth radiculopathy on the right side 
5. Thirty-two sets of X-rays were described by Dr. Cameron and Dr. Sanders as excessive. 
6. The following tests were performed and results obtained:


 1/4 X-rays - Normal

 1/17 CT Scan - Normal with no herniated nucleus pulposus

 1/30 CT Scan - Negative

 2/27 EMG - Suggested sacral first radiculopathy on right side; no abnormality.

 3/16 Myelogram - Insensitive, but otherwise normal

 3/16 Post-myelogram CT of the lumbar spine - Normal

 3/17 MRI - Normal

 6/19 Discogram - Pain radiating into the right leg after dye was injected at L5-S1; minor pain
in lumbar area when injected at L4-L5. Report noted moderate amount of subarachnoid
contrast and unremarkable disc spaces. 

 6/20 MRI - Unremarkable with no evidence of herniation, extrusion, nerve root compression, or displacement. 

 7/15 Preoperative diagnosis: "Probable herniated lumbar disk at L4-L5, possible L5-S1 involvement, failed conservative treatment, and facet arthropathy."

 7/16 X-rays with AP and lateral views - Normal

 5/2/91 Post-surgical CT Scan - mild generalized bulging of L4-L5 disk. 
7. The diagnostic tests produced the following results: 

 MRI of lumbar spine--normal; no significant bulges or protrusions
 EMG--suggested Sacral First Radiculopathy on the right side
 Physical exam by Scheffey--tenderness across lumbosacral spine & into buttocks
 Myelogram--normal 
 Post-myelogram CT Scan--slight bulging of L5-S1 disc
 Discogram at L5-S1--negative
 MRI of lumbar spine--negative; no evidence of disc herniation identified 
 Discogram--2cc's of contrast material injected at L4-5, none at L5-S1; disc space at L4-5
was unremarkable; pain radiating into legs with injection at L4-5; impression: abnormal study
as noted above. 
8. The Board determined that Scheffey violated section 3.08(4)(G) of the Act by flagrantly and
persistently overcharging. See Act § 3.08(4)(G). Section 3.08(4)(G) of the Act states that it is a violation
to flagrantly or persistently overcharge. Id. Even assuming there is substantial evidence to support a
conclusion that Scheffey violated section 3.08(4)(G) by flagrantly overcharging, the Board's order
specifically states in conclusion of law five that Scheffey flagrantly and persistently overcharged. We must
measure the sufficiency of the agency's order "by what it says" and not by judicial speculation about how
the agency reached its final decision. Morgan Drive Away, Inc. v. Railroad Comm'n, 498 S.W.2d 147,
152 (Tex. 1973); Sensitive Care, Inc. v. Texas Dept. Human Servs., 926 S.W.2d 823, 828-29 (Tex.
App.--Austin 1996, no writ). 




ustice

Before Justices Powers, Aboussie and Jones

Reversed and Rendered

Filed: July 3, 1997

Publish

1. The diagnostic tests performed and the results obtained were: 



 Nerve conduction study showing mild CTS
 Tinel's test showing possible CTS
 Phalen's test showing positive CTS
 Nerve conduction velocity study did not support CTS diagnosis
 Electromyographic Examination ("EMG") did not show CTS, but showed possible
radiculopathy. 
2. "Unbundling" occurs when a doctor charges for individual elements of a procedure that should be
included in the charge for the overall procedure. 
3. G.M. initially underwent the following tests:


 Three-dimensional CT of the lumbar spine showing minimal narrowing at the L5-S1 interspace
and moderate narrowing at the L5-S1 neural foramina bilaterally 


 

 MRI of the cervical spine showing degenerative changes
 MRI of the lumbar spine showing mild degenerative changes with a mild generalized bulging
annulus at L4-L5 and a transitional L5 vertebra
 CT of the lumbar spine showing a probable disc herniation at L4-L5 and prominent central
bulging calcification at L5-S1 
4. The following tests were performed in the hospital:

 Myelogram with normal results except for the transitional L5 vertebra and mild degenerative
changes 
 Post-myelogram CT scan suggested a midline posterior L4-L5 disc herniation. The herniation
was not, however, substantiated on the myelogram. 
 Electrical nerve studies suggesting lumbar fifth radiculopathy on the right side 
5. Thirty-two sets of X-rays were described by Dr. Cameron and Dr. Sanders as excessive. 
6. The following tests were performed and results obtained:


 1/4 X-rays - Normal

 1/17 CT Scan - Normal with no herniated nucleus pulposus

 1/30 CT Scan - Negative

 2/27 EMG - Suggested sacral first radiculopathy on right side; no abnormality.

 3/16 Myelogram - Insensitive, but otherwise normal

 3/16 Post-myelogram CT of the lumbar spine - Normal

 3/17 MRI - Normal

 6/19 Discogram - Pain radiating into the right leg after dye was injected at L5-S1; minor pain
in lumbar area when injected at L4-L5. Report noted moderate amount of subarachnoid
contrast and unremarkable disc spaces. 

 6/20 MRI - Unremarkable with no evidence of herniation, extrusion, nerve root compression, or displacement. 

 7/15 Preoperative diagnosis: "Probable herniated lumbar disk at L4-L5, possible L5-S1 involvement, failed conservative treatment, and facet arthropathy."

 7/16 X-rays with AP and lateral views - Normal

 5/2/91 Post-surgical CT Scan - mild generalized bulging of L4-L5 disk. 
7. The diagnostic tests produced the following results: 

 MRI of lumbar spine--normal; no significant bulges or protrusions
 EMG--suggested Sacral First Radiculopathy on the right side
 Physical exam by Scheffey--tenderness across lumbosacral spine & into buttocks
 Myelogram--normal 
 Post-myelogram CT Scan--slight bulging of L5-S1 disc
 Discogram at L5-S1--negative
 MRI of lumbar spine--negative; no evidence of disc herniation identified 
 Discogram--2cc's of contrast material injected at L4-5, none at L5-S1; disc space at L4-5
was unremarkable; pain radiating into legs with injection at L4-5; impression: abnormal study
as noted above. 
8. The Board determined that Scheffey violated section 3.08(4)(G) of the Act by flagrantly and
persistently overcharging. See Act § 3.08(4)(G). Section 3.08(4)(G) of the Act states that it is a violation
to flagrantly or persistently overcharge. Id. Even assuming there is substantial evidence to support a
conclusion that Scheffey violated section 3.08(4)(G) by flagrantly overcharging, the Board's order
specifically states in conclusion of law five that Scheffey flagrantly