891 S.W.2d 333 (1995)
TEXAS STATE BOARD OF MEDICAL EXAMINERS, Appellant,
v.
Dennis H. BIRENBAUM, M.D., Appellee.
No. 3-93-664-CV.
Court of Appeals of Texas, Austin.
January 11, 1995.
Rehearing Overruled February 22, 1995.
*334 Dan Morales, Atty. Gen., Karen Pettigrew, Asst. Atty. Gen., Austin, for appellant.
Robert Summers, Scott, Douglass & Luton, Austin, for appellee.
Before POWERS, ABOUSSIE and KIDD, JJ.
KIDD, Justice.
Texas State Board of Medical Examiners ("the Board"), appellant, revoked the medical license of Dr. Dennis Birenbaum, appellee, after finding that he had engaged in persistent and flagrant overcharging of patients. The district court reversed the Board's order, concluding that substantial evidence did not exist in the record to uphold the decision to revoke. The Board appeals, arguing that the trial court erred in holding that there was not substantial evidence to support the revocation. We will affirm the trial court's judgment.

THE BACKGROUND
In the summer of 1989, two insurance companies filed complaints with the Board against Birenbaum for charging excessive fees to patients. The Board then filed a formal complaint against Birenbaum, an oncologist, alleging that he had engaged in unprofessional or dishonorable conduct likely to deceive, defraud, or injure the public by persistently and flagrantly overcharging or overtreating patients. Tex.Rev.Civ.Stat.Ann. art. 4495b, § 3.08(4)(G) (West Supp.1995).
On September 23 through September 25, 1991, a hearing was held before a hearings examiner to determine whether Birenbaum had violated the Medical Practice Act by persistent and flagrant overcharging. Id. The Board's complaint concerned medical bills for seven of Birenbaum's patients. The Board argued that Birenbaum had violated the Act by: (1) charging patients for consultations while he was the attending physician; (2) charging for isolation, hyperalimentation, and platelet infusion,[1] which was inappropriate *335 because these treatments should have been subsumed under the general charge for a hospital visit; (3) charging on a per-agent basis for chemotherapy administration; and (4) charging for services that were allegedly rendered after a patient's death.[2]
The hearings examiner subsequently issued a Proposal for Decision ("PFD") and a proposed order on October 12, 1992 that concluded that Birenbaum had neither engaged in dishonorable or unprofessional conduct likely to deceive, defraud, or injure the public nor engaged in persistent or flagrant overcharging. The PFD and the proposed order were presented to the Board for final action on February 27, 1993. On March 2, 1993, the Board issued an order that disagreed with the hearings examiner's PFD and revoked Birenbaum's license for persistent and flagrant overcharging. The district court reversed the Board's decision, citing a lack of substantial evidence in the record to support the revocation. The Board appeals by one point of error, arguing that its order was supported by substantial evidence.

EVIDENCE PRESENTED AT THE HEARING
The evidence presented at the hearing primarily consisted of the testimony of four witnesses: Dr. Douglas Whitley, an emergency room physician and a consultant for Aetna Insurance Company, the principal insurance company that challenged Birenbaum's charges; Dr. Lester Hoaglin, a retired oncologist; Dr. Stephen Cohen, a practicing oncologist; and Dr. Birenbaum.[3] Because the issue presented in this case concerns whether substantial evidence supports the Board's revocation, we will briefly review each witness's testimony.
Dr. Whitley testified: His only experience with oncology was during his residency; he was unable to render an opinion on the severity of complications presented in each of the seven patients; he had never established a chemotherapy protocol; Aetna determines the amount of fees that it will pay through the use of Current Procedural Terminology ("CPT") codes, which require a doctor to use specific codes for the different procedures performed; certain procedures and services are difficult to categorize, which can lead to inequitable reimbursement of physicians; he was unaware that oncologists around the United States used seven different methods of coding in order to receive adequate reimbursement for chemotherapy services; he had no personal knowledge of the amount of time that Birenbaum spent with each of the seven patients; Birenbaum had telephoned him and was rude, obnoxious, and persistent; that he finally became "mad" as a result of these calls; and that he filed the complaint against Birenbaum with the Board after Birenbaum filed a complaint against Aetna with the North Carolina Insurance Commission.
Dr. Hoaglin is an experienced oncologist who had been at the forefront of his medical field until he ceased treating patients in 1989. Dr. Hoaglin testified as to the medical bills for each of the seven patients, comparing what he would have charged to what Birenbaum charged. In many instances, Birenbaum's charges were several times higher than Hoaglin's would have been for the same treatments. He testified that, based on his review of the billing and medical records, Birenbaum had engaged in persistent and flagrant overcharging, and that he had improperly charged for certain services such as hyperalimentation, isolation, platelet infusions, and consultations with himself.
Dr. Hoaglin also opined, however, that the CPT codes do not determine what a physician is permitted to bill for, but rather that the level of service and care the patient *336 receives is determinative of the correct charges. He also admitted that he was unaware of how much time Birenbaum had spent with each of the seven patients and that he did not read completely through the medical records in order to determine whether Birenbaum was indeed overcharging patients. He testified that occasionally he had billed patients for complications or "second events" because of the extended care required and the amount of time that he had spent with the patient.
Dr. Stephen Cohen, a practicing oncologist, testified that while his patients' illnesses were as complicated as those of Birenbaum's seven patients, he consistently charged significantly less than Birenbaum charged for similar services. After reviewing the billing and medical records for the seven patients, Cohen opined that Birenbaum's billing practices were excessive. Cohen also testified, however, that because the CPT codes regard oncologists as internists, oncologists are reimbursed at the same level as physicians whose practices generally involve less complicated patients. Cohen stated that this level of compensation often does not adequately reimburse an oncologist for his or her services. Dr. Cohen also admitted that the CPT codes are being reevaluated in order to create codes that will adequately compensate oncologists. Despite his admission that the CPT codes provide insufficient reimbursement, Dr. Cohen nevertheless stated that Birenbaum was both overcharging for services he was permitted to bill for and was charging for services which Cohen believed to be inappropriate.
Finally, Dr. Birenbaum testified that none of his patients had ever complained about his fees, that all seven of the patients identified in the complaint were among his most complicated and difficult cases; that he personally reviewed both hyperalimentation and the platelet infusions and, thus, his charges for these procedures were fair; that he spent several hours a day with these patients; that he has 375 to 400 patients currently under his care; that Aetna was the first insurance company to complain of his charges; and that he had used the CPT code for consultations to cover second events or new problems that arose in a patient that required his attention, but for which the CPT codes did not have a category.

DISCUSSION
As a preliminary matter, we begin by noting that a physician and a patient are free to contract for the physician's services on any terms they choose. See Childs v. Weis, 440 S.W.2d 104, 106-07 (Tex.Civ. App.Dallas 1969, no writ) (noting that the "relation of physician and patient is contractual and wholly voluntary, created by agreement").[4] The relationship between a physician and a patient concerns "the professional services and skill [the physician] offers and the patient purchases." Thomas v. St. Joseph Hosp., 618 S.W.2d 791, 796 (Tex.Civ. App.Houston [1st Dist.] 1981, writ ref'd n.r.e.). Under these general principles, the parties are free to contract as they see fit, as long as their agreement does not contravene public policy. See Scoville v. SpringPark Homeowners Ass'n, Inc., 784 S.W.2d 498, 502 (Tex.App.Dallas 1990, writ denied). Therefore, we are certainly mindful of the potential impact of this cause on a patient's right to freely contract with a physician of his or her choice.
This principle of freedom of contract, however, conflicts with the legislative decision that some charges may be so excessive that the State has the responsibility to sanction physicians who engage in persistent or flagrant overcharging of patients. Tex.Rev.Civ. Stat.Ann. art. 4495b, § 3.08(4)(G) (West Supp.1995). The tension between these two positions is explicitly joined in the instant cause, in which a physician's license was revoked despite the fact that none of his patients had complained that his billing methods constituted persistent or flagrant overcharging. With these principles in mind, we now turn to the merits of this appeal.

*337 Standard of Review
In reviewing the administrative decision of the Board, we use the substantial evidence standard defined under the Administrative Procedure Act ("APA"). See Tex. Gov't Code Ann. § 2001.174(2)(E) (West 1995). Although substantial evidence requires more than a scintilla of evidence, "the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence." Texas Health Facilities Comm'n v. Charter MedicalDallas, Inc., 665 S.W.2d 446, 452 (Tex.1984). We are not permitted to substitute our judgment for that of the agency as to the weight of the evidence. Public Util. Comm'n v. Gulf States Utils. Co., 809 S.W.2d 201, 211 (Tex.1991). Decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. Charter Medical, 665 S.W.2d at 453; Imperial Am. Resources Fund, Inc. v. Railroad Comm'n, 557 S.W.2d 280, 286 (Tex.1977). We must uphold the agency's actions if the evidence is such that reasonable minds could have reached the conclusion the Board must have reached in order to justify its action. Charter Medical, 665 S.W.2d at 453.
The Board's order outlines the charges that Birenbaum billed the seven patients and concludes that Birenbaum engaged in persistent and flagrant overcharging by billing for chemotherapy on a per-agent basis, hyperalimentation, platelet infusion, isolation, and consultations with himself when he was the attending physician. The Board, however, fails to define what constitutes "persistently or flagrantly overcharging" under the statute. Tex.Rev.Civ.Stat. Ann. art. 4495b, § 3.08(4)(G) (West Supp. 1995). Similarly, the statute does not define either "persistent" or "flagrant." Id. In the PFD, however, the hearings examiner concluded that the term "persistently or flagrantly overcharging" was composed of three elements"persistent," "flagrant," and "overcharging,"and the Board must prove both that Birenbaum overcharged and that his overcharging was either persistent or flagrant in order to conclude that Birenbaum had violated the statute. We agree with this analysis and we will use it in determining whether substantial evidence exists in the record to support each element.
A. Overcharging
We initially examine whether the administrative record supports the Board's determination that Birenbaum overcharged the seven patients whose billing records were at issue in this complaint. The statute does not specify what constitutes "overcharging," but the term is generally defined as charging "excessively or beyond a due rate." Webster's Third New International Dictionary 1606 (Philip B. Gove ed. 1986).
We begin by noting that the hearings examiner discounted Whitley's and Hoaglin's testimony in her PFD because she questioned their credibility.[5] The Board, however, clearly found both Whitley and Hoaglin to be credible witnesses. Although we are aware of this discrepancy in the findings on credibility, we are not permitted to substitute our judgment for that of the agency since the agency is the primary fact-finding body. Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer, 662 S.W.2d 953, 956 (Tex.1984); see Wishnow v. Texas Alcoholic Beverage Comm'n, 757 S.W.2d 404, 409 (Tex. App.Houston [14th Dist.] 1988, writ denied) ("The court may not invade the fact finding authority of the agency."). "Power of decision resides in the agency and not in the staff.... Staff recommendations may be accepted in whole or in part by the agency, or such recommendations may be rejected outright." *338 City of Frisco v. Texas Water Rights Comm'n, 579 S.W.2d 66, 72 (Tex. Civ.App. Austin 1979, writ ref'd n.r.e.). We find it unnecessary to address this apparent discrepancy between the findings of the hearings examiner who presided over the administrative proceeding and those of the Board because we conclude that Cohen's testimony alone provided sufficient evidence to support the Board's determination that Birenbaum had overcharged his patients. Cohen testified that he had examined both the billing records and the underlying medical records for each of the seven patients before concluding that Birenbaum's charges were excessive. Cohen testified that Birenbaum not only overcharged for certain procedures, but that he also charged for services that would normally be included in the daily hospital charge. The Board correctly notes in its order that Birenbaum charged for certain servicesconsultations with himself when he was the attending physician, chemotherapy administration, isolation, hyperalimentation, and platelet infusionwhich the Board's witnesses all testified should have been included under the regular hospital charge. In addition to charging separately for each of these services, Birenbaum also billed for the normal hospital charge, thereby resulting in double-billings.
Cohen testified that oncologists are undercompensated under the current CPT coding system, and that he did not think it was improper to code in a more "elaborate" manner than a routine visit if the visit involved additional time. He also testified that he was familiar with the different coding methods that oncologists use in order to obtain adequate reimbursement, but that he nevertheless felt that some of Birenbaum's charges were both improper and excessive as charged. Dr. Cohen admitted that he is "in a combative relationship with insurance companies" and that he has engaged in rude conversations with insurance carriers because "there's a certain amount of expertise that you need to understand whether anyone is, quote, ripping off the system or not, and they don't have it." In spite of his disparagement of insurance carriers' ability to determine fair charges, he nonetheless concluded that "[i]f an insurance company paid [Birenbaum's] bills routinely, based on these charges, I'd be flabbergasted," because "I'm not happy about his bills, so I can imagine the insurance company that's paying it has got to be livid."
Under the substantial evidence standard of review, the Board only has to show that its order was reasonable, not that it was correct. Railroad Comm'n v. Pend Oreille Oil & Gas Co., Inc., 817 S.W.2d 36, 41 (Tex.1991). In determining reasonableness, we must decide whether "the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action." Charter Medical, 665 S.W.2d at 453. We conclude that the record contains substantial evidence to support the Board's determination that Birenbaum overcharged both by charging more than other oncologists would for similar services and by charging for services that other oncologists disputed were proper to charge for under the current CPT codes.
B. Flagrant or Persistent Overcharging
Having concluded that the record supports the determination that overcharging occurred, we now proceed to determine whether these overcharges were either flagrant or persistent. "Flagrant" is not defined in the statute, but one dictionary defines the word as "extremely, flauntingly, or purposefully conspicuous; glaringly evident; notorious." Webster's Third New International Dictionary 862-63 (Philip B. Gove ed. 1986). The statute also does not define persistent, but it is generally defined as "continuing in a course of action without regard to opposition or previous failure; tenacious of position or purpose; existing for a long or longer than usual time or continuously." Id. at 1686. Therefore, we must ascertain whether Birenbaum's charges were either so excessive as to amount to extremely conspicuous or glaringly evident overcharging or occurred so repetitively as to be tenacious or continuous.
First, we examine the Board's conclusion that Birenbaum's overcharging was flagrant. Birenbaum testified that his charges were justified because he actually performed services *339 that were deserving of compensation. He admitted that he had miscoded some services, but testified that the miscoding did not render those services noncompensable. Birenbaum testified that, contrary to the opinion of the other witnesses, he charged for certain services because of the amount of time and effort that was involved in carrying out his duties.[6]
Birenbaum testified that he spent anywhere from two to six hours a day on each of these patients, depending on what their complications were at any particular time. He also testified that he spent time with the families discussing possible physical and psychological effects that the cancer might have on the patient. Marlene Spadoni, an oncological nurse who works with Birenbaum, corroborated Birenbaum's testimony about the time and effort he expended:
He's there in the morning when I arrive.... He will stay, oh, it depends, for a matter of hours. Then he comes back around noon, and then in the evening he's back again. I have been there late at night and he's been in. I've come in the middle of the night and he's been there.... He's very, very hands on.... And it seems like he lives at the hospital. But if he's not there, then he's constantly calling....
When asked to compare Birenbaum's dedication to that of other oncologists in the unit, Spadoni responded:
I can't speak to their dedication; I don't know. I mean, I don't see them.... I don't see the overt type of thing, being physically in the building, being with the patients, reassuring the patients, touching the patients, spending time with the family. This is not there. But dedication is a subjective thing.
(emphasis added). The difficulty with the Board's decision that Birenbaum flagrantly overcharged patients lies in the fact that none of the Board's expert witnesses had knowledge of the amount of time that Birenbaum had spent with the seven patients at issue here. Flagrant overcharging must be shown by proof that Birenbaum's charges were excessive in light of the amount of time that he was involved with each patient. Two of the Board's witnesses had looked principally at the billing records in concluding that Birenbaum's charges were unwarranted. Although Cohen had examined both the billing records and the underlying medical records, he admitted that these records did not reflect the amount of time that Birenbaum had spent with the seven patients.
Given that the Board was unaware of the amount of time and effort involved in the performance of Birenbaum's duties to his patients, we are disturbed by the Board's conclusion that Birenbaum flagrantly overcharged. Birenbaum testified that these were seven of his most difficult cases, and that he often simply charged a limited or intermediate visit charge for less complicated patients. None of Birenbaum's patients had complained that his charges were unfair or that he was being compensated for services that he did not perform. Indeed, at least one patient and his wife defended Birenbaum after Aetna refused to reimburse him, urging Aetna to compensate Birenbaum for the exemplary services he had provided.[7] In light *340 of the fact that the evidence in the record all supports Birenbaum's claim that he expended extensive amounts of time on these patients, we fail to see how the Board can conclude that Birenbaum flagrantly overcharged in the absence of any controverting evidence that Birenbaum's charges were excessive given the amount of time spent with patients.
A similar problem arises when we examine whether there is substantial evidence to support the Board's determination that Birenbaum engaged in persistent overcharging. Birenbaum's practice included more than 375 patients, yet the Board focused on seven very complicated cases in determining that Birenbaum had persistently overcharged. The Board takes the position that "persistent overcharging" can be proved by examining the charges billed to one patient or a few patients, rather than by determining it across the whole spectrum of his patients. The statute, however, does not provide such a definition nor has the Board previously indicated by its rulemaking power that "persistent" can be proved merely by the records of one or a few patients.
To conclude that Birenbaum "persistently overcharged" requires a thorough examination of Birenbaum's charges across the whole spectrum of his patients. Since the Board did not define persistent in its order, we conclude that under the general definition of the term "persistent," this record does not provide substantial evidence that Birenbaum persistently overcharged.[8]
Examining the evidence in the record, we agree with the district court that the record does not contain substantial evidence to support the Board's finding of either persistent or flagrant overcharging. Under the APA, a reviewing court is permitted to overturn the agency's decision based on a lack of substantial evidence only if substantial rights of the appellant have been prejudiced. Tex. Gov't Code Ann. § 2001.174(2)(E) (West 1995); Charter Medical, 665 S.W.2d at 452. Having concluded that there is a lack of substantial evidence, we overrule the Board's point of error.
Although Birenbaum raised several cross-points attacking procedural irregularities in the Board's decision, we need not address these because we hold that the trial court correctly reversed the Board's decision. We affirm the trial court's judgment.
NOTES
[1] The Board's Findings of Fact offered the following definitions for these procedures:

25. Isolation of a patient is a method to protect the patient from contracting an illness from the physician or hospital staff (also known as reverse isolation) whereby a physician puts on a mask, gown and gloves....
27. Hyperalimentation is also known as total parenteral nutrition and is a form of supplying intravenous nutrients to patients who cannot either absorb them or take them in any other fashion. It is a complex balance of proteins, fats, electrolytes, vitamins and carbohydrates.
Although the Board did not specifically define platelet infusion in its findings of fact, it is a process by which platelets are introduced into the blood after chemotherapy. As the Board explained: "21. Chemotherapy can also cause a drop in the white cell count (increasing risk of infection) and the platelet count, which clots the blood increasing risk of bleeding to death or other complications." The purpose of platelet infusion is to provide extra clotting factors for cancer patients whose own platelets have been destroyed by chemotherapy.
[2] Birenbaum testified that this charge was the result of a computer error, that his office staff had notified the insurance company, and that he had not received compensation for any services charged after the patient's death.
[3] Other witnesses testifying on behalf of Birenbaum included: Dr. Amanullah Khan, an oncologist; Marlene Spadoni, a registered nurse who works with Birenbaum; and Jack Ayres, an attorney, who testified about the difficulties involved in using the Current Procedural Terminology codes.
[4] Some of the Board's own witnesses conceded during the hearing that a patient and a doctor can contract for services at any price, but problems arise when an insurance company is expected to pay the amount to which the parties have agreed.
[5] In her findings of fact, the hearings examiner concluded that Whitley's and Hoaglin's credibility tainted their testimony:

26. Dr. Whitley's relationship with and conduct on behalf of the Aetna Life and Casualty Insurance Company adversely affects the credibility of his testimony in this case.
27. Dr. Whitley's lack of direct training and experience in the field on oncology, hematology and hyperalimentation adversely affects the credibility of his testimony in this case.
. . . . .
37. Dr. Hoaglin's testimony regarding his own billing practices adversely affects the credibility of his testimony in this case, as does the fact that he has retired and has not seen patients since 1989.
[6] For example, as concerned hyperalimentation, Birenbaum testified extensively about how complicated the process is: he must perform daily calculations to determine the proper nutritional balance; he reviews the blood tests daily; and has to make changes immediately as they are needed. He stated that over 2,000 papers on hyperalimentation had been published in the five years preceding the hearing, thus contradicting other witnesses' testimony that hyperalimentation is a fairly simple standardized process. Spadoni, who testified that hyperalimentation has to be addressed continuously and that Birenbaum reviewed the reports daily and then made changes accordingly, bolstered Birenbaum's testimony.
[7] Patient C.D.'s wife wrote to Aetna regarding the insurance claims:

Doctor Birenbaum not only used all his medical ability, but has given his personal attention to my husband and myself.... We have had to contact him after office hours during the night, on weekends and many times during office hours by phone. Dr. Birenbaum has never failed to return any of our calls immediately to give me instructions and information as to how and what to do for my husband.... Dr. Birenbaum never billed the insurance company for these services.
. . . .
The results, to date, of all the time spent in making the decisions as to what method of chemotherapy and radiation therapy to use, medications to be given, all the necessary tests to be made, keeping a constant check on all blood tests and X-rays and analyzing the test results, has been that my husband is not only getting better, he is getting well and progressing much faster than we could have hoped for.... [I]f we are forced to be treated by another oncologist because our insurance will not even pay a reasonable amount to Dr. Birenbaum for services that most doctors would consider above and beyond what is required of them, my husband's physical and mental health will deteriorate to the point that he will not get any better, only get worse.
[8] Indeed, the evidence showed that after Aetna raised its complaint, Birenbaum called in an expert who helped him create a more uniform system of coding, and that since that time, Birenbaum has received no complaints from any insurance companies regarding his charges.