**TEXAS STATE BOARD OF MEDICAL EXAMINERS, Appellant,**

v.

**Eric Heston SCHEFFEY, M.D., Appellee.**

**No. 03–96–00216–CV.**

Court of Appeals of Texas, Austin.

July 3, 1997.

Rehearing Overruled Aug. 28, 1997.

Jennifer Gilchrist, Assistant Attorney General, Austin, for Appellant.

Ace Pickens, Brown McCarroll & Oaks Hartline, Austin, for Appellee.

Before POWERS, ABOUSSIE and JONES, JJ.

ABOUSSIE, Justice.

The State Board of Medical Examiners suspended Eric Heston Scheffey's license to practice medicine. Scheffey sought judicial review of the Board's order in district court. The district court reversed the Board's order, holding that the decision to suspend the license was not supported by substantial evidence. The Board appealed to this Court. We will reverse the trial court's judgment.

## BACKGROUND

In a formal complaint, the Board charged Scheffey with three violations of the Medical Practice Act. See Tex.Rev.Civ. Stat. Ann. art. 4495b (West Supp.1997) (the "Act"). The complaint charged Scheffey with: (1) deviations from the minimum acceptable standard of care; (2) flagrant and persistent overcharging; and (3) flagrant and persistent overtreatment. The Board's complaint stated that these violations of the Act were grounds for cancellation, revocation, or suspension of Scheffey's license to practice medicine pursuant to section 4.01 of the Act. See Act § 4.01.

An administrative law judge ("ALJ") conducted an administrative hearing and submitted a proposal for decision and a proposed order to the Board recommending revocation of Scheffey's medical license. The full Board then considered Scheffey's case and declined to accept the ALJ's recommendation to revoke Scheffey's license. Instead, the Board adopted the ALJ's findings of fact and suspended Scheffey's license but stayed the suspension and placed him on probation for five years subject to certain conditions.

The district court reversed the Board's decision, concluding that there was not substantial evidence to support the Board's action. The Board appealed to this Court in a single point of error, arguing that its order was supported by substantial evidence.

## EVIDENCE PRESENTED AT THE HEARING

Multiple witnesses testified at the Board's hearing, focusing on four of Scheffey's medical patients. Because the issue before this Court concerns whether substantial evidence supports the Board's decision to suspend his license, we will briefly discuss the evidence surrounding each case.

*Patient D.G.*

Following a wrist injury, D.G. was treated by Scheffey and other doctors and he was administered various diagnostic tests.[1] Several doctors, including Dr. Scheffey, concluded that D.G. had mild carpal tunnel syndrome ("CTS"). The experts disagreed, however, as to whether the test results indicated a carpal tunnel release was required. Scheffey performed this surgical procedure on D.G.

At the hearing before the Board, Dr. Flatt testified that the only tests supporting a diagnosis of CTS were the Tinel's test and Phalen's test and that they were not sufficient evidence on which to make an af-

---

1. The diagnostic tests performed and the results obtained were:
   - Nerve conduction study showing mild CTS
   - Tinel's test showing possible CTS
   - Phalen's test showing positive CTS
   - Nerve conduction velocity study did not support CTS diagnosis
   - Electromyographic Examination ("EMG") did not show CTS, but showed possible radiculopathy.

firmative diagnosis. He believed the nerve conduction study showed normal results; however, he conceded that each doctor could interpret the results differently. Dr. Flatt testified that the nerve conduction study showed, at most, only mild CTS and revealed improvement from the use of a wrist splint. He supported his assertion with the negative Electromyographic Examination ("EMG") performed in December 1988. Additionally, Scheffey's records do not indicate that he administered any other tests on D.G., and he did not review the EMGs, one of which specifically stated that it would not support a diagnosis of CTS. Dr. Flatt stated that Scheffey's diagnosis of CTS was not medically indicated based on Scheffey's records, D.G.'s complaints, the physical findings, and the EMG and nerve conduction studies. He, therefore, concluded that the carpal tunnel surgery was not medically indicated and was not based on a solid diagnosis.

Scheffey's records reflect that D.G.'s surgery lasted twenty minutes, but Drs. Cameron, Crouch and Flatt testified that in that period of time, Scheffey could not possibly perform all the procedures he listed in the operative report. All three doctors agreed that a carpal tunnel release could take about twenty minutes to perform; however, the additional procedures allegedly performed should have added at least one hour. The doctors also took issue with various elements of the surgery, including necessary instruments which were not mentioned in the surgical report, unnecessary procedures, and findings that were not supported by the medical history and records.

Finally, Dr. Cameron and Dr. Crouch testified about Scheffey's charges. Both testified that Scheffey inappropriately charged D.G. for an initial consultation after she had been his patient for several months and that Scheffey's fees were excessive. Dr. Crouch testified that Scheffey engaged in "unbundling" [2] in his billing for D.G.'s carpal tunnel release. Scheffey and his office manager, Susan Towne, testified that there were no guidelines for global fees, and Towne additionally testified that the itemization of surgical procedures and charges was an acceptable practice for the filing of insurance claims. Dr. Cameron agreed that this practice is common, but maintained that Scheffey had excessively billed and that the overcharging amounted to dishonorable conduct.

*Patient G.M.*

G.M. was treated by Scheffey for neck and back pain which radiated into his legs. Scheffey prescribed physical therapy and performed several diagnostic tests.[3] Scheffey's impression after the first set of diagnostic tests was that G.M. had a herniated lumbar disc and a cervical sprain with a bulging disc. Scheffey admitted G.M. to the hospital for additional tests [4] and then performed back surgery on G.M.

G.M.'s condition improved after the surgery, but he subsequently experienced pain again. G.M. continued to seek treatment from Scheffey and underwent additional testing. Scheffey performed a second surgery on G.M.,after which G.M. continued to complain of pain and soreness across his back. At office visits after the second surgery, Scheffey continued to order diagnostic tests

---

2. *"Unbundling"* occurs when a doctor charges for individual elements of a procedure that should be included in the charge for the overall procedure.

3. G.M. initially underwent the following tests:
   - Three-dimensional CT of the lumbar spine showing minimal narrowing at the L5–S1 interspace and moderate narrowing at the L5–S1 neural foramina bilaterally
   - MRI of the cervical spine showing degenerative changes
   - MRI of the lumbar spine showing mild degenerative changes with a mild generalized bulging annulus at L4–L5 and a transitional L5 vertebra

   - CT of the lumbar spine showing a probable disc herniation at L4–L5 and prominent central bulging calcification at L5–S1

4. The following tests were performed in the hospital:
   - Myelogram with normal results except for the transitional L5 vertebra and mild degenerative changes
   - Post-myelogram CT scan suggested a midline posterior L4–L5 disc herniation. The herniation was not, however, substantiated on the myelogram.
   - Electrical nerve studies suggesting lumbar fifth radiculopathy on the right side

and routinely took X-rays of G.M.'s lumbar spine.

The Board determined that Scheffey overtreated G.M. by performing surgery when it was not medically indicated. Dr. Sanders testified that a case could be made for performing the first surgery on G.M. However, he questioned Scheffey's decision to operate when G.M. had unexplained pain. Dr. Sanders opined that Scheffey should have obtained psychological studies before the first surgery. He testified that the second surgery was medically indicated but that the fusion performed in the second surgery should have been performed in the first surgery. Dr. Sanders also criticized Scheffey's choice of diagnostic testing after the first surgery and believed that an MRI would have been the most helpful test. Dr. Cameron supported Scheffey's assertion that an MRI was not possible on G.M. Additionally, at least one MRI was performed on G.M. when it became possible.

Dr. Cameron and Dr. Sanders testified regarding Scheffey's overcharging for the services provided to G.M. They testified that Scheffey billed for a comprehensive history and physical that was unnecessary and for intermediate follow-up office visits that should have been simple check-up reviews. Additionally, Dr. Mulloy, who testified on Scheffey's behalf, agreed that Scheffey should not have charged for reading three reports interpreting lumbar myelograms. Both Dr. Cameron and Dr. Sanders testified that various procedures during both surgeries were either superfluous or unnecessary charges or were simply unjustified. Additionally, both stated that aspects of G.M.'s follow-up care should have been included in the global fees for the surgeries. Overall, the doctors set forth multiple examples of unnecessary charges, unjustifiable charges, and excessive diagnostic testing.[5]

*Patient S.R.*

S.R. was treated by Scheffey for back and leg pain. After multiple diagnostic tests were performed,[6] Scheffey performed back surgery on S.R. Drs. Hall, Sanders, and Cameron reviewed S.R.'s case; all three agreed that there were inadequate indications for surgery. They pointed to multiple diagnostic tests that produced normal or negative results and stated that other test results did not provide a definitive diagnosis and were "weak" bases upon which to perform surgery. Dr. Sanders and Dr. Hall also asserted that the highly sensitive post-myelogram CT would have revealed a need for surgery. Dr. Sanders stated that with the normal studies, S.R. did not exhibit enough medical indications to benefit from surgery and pointed out that Scheffey never made a definitive diagnosis until the day of the surgery. Dr. Hall and Dr. Sanders also testified that aspects of Scheffey's operative report were inconsistent with the diagnostic studies.

Regarding Scheffey's charges, Dr. Cameron testified that Scheffey's initial comprehensive consultations were unjustified because an initial comprehensive examination was performed at S.R.'s first visit. He criticized Scheffey for twice billing S.R. for interpreting a lumbar discography when a radiologist performed the interpretation. Dr. Cameron testified that Scheffey miscoded and overcharged for the procedures during S.R.'s surgery, and while Ms. Towne, Scheffey's office

---

**5.** Thirty-two sets of X-rays were described by Dr. Cameron and Dr. Sanders as excessive.

**6.** The following tests were performed and results obtained:
1/4 X-rays—Normal
1/17 CT Scan—Normal with no herniated nucleus pulposus
1/30 CT Scan—Negative
2/27 EMG—Suggested sacral first radiculopathy on right side; no abnormality.
3/16 Myelogram—Insensitive, but otherwise normal
3/16 Post-myelogram CT of the lumbar spine— Normal
3/17 MRI—Normal

6/19 Discogram—Pain radiating into the right leg after dye was injected at L5–S1; minor pain in lumbar area when injected at L4–L5. Report noted moderate amount of subarachnoid contrast and unremarkable disc spaces.
6/20 MRI—Unremarkable with no evidence of herniation, extrusion, nerve root compression, or displacement.
7/15 Preoperative diagnosis: "Probable herniated lumbar disk at L4–L5, possible L5–S1 involvement, failed conservative treatment, and facet arthropathy."
7/16 X-rays with AP and lateral views—Normal
5/2/91 Post-surgical CT Scan—mild generalized bulging of L4–L5 disk.

manager, opined that the use of the particular code was a mistake, she did not have personal knowledge of any mistake, and no member of Scheffey's staff ever corrected the mistake. Finally, Dr. Cameron stated that Scheffey's charge for S.R.'s surgery was excessive and not the usual and customary charge.

*Patient D.M.*

D.M., a forty-two-year-old woman, sought treatment from Scheffey for a back and hip injury. Scheffey ordered multiple diagnostic tests before he performed surgery.[7] Scheffey's preoperative diagnosis was that D.M. suffered from a herniated nucleus pulposus and a bulging disc and that conservative treatment had failed. Scheffey performed back surgery at two levels.

At the hearing, Dr. Hall and Dr. Cameron testified that Scheffey did not have sufficient objective evidence to perform surgery on D.M. Both believed that the post-myelogram CT scan revealing a slight bulge was a flimsy basis for surgery. Dr. Cameron also noted that most forty-to fifty-year-old persons will have some slight bulging with no symptoms. The doctors discredited the abnormal finding after the second discogram; Dr. Cameron agreed with Dr. Hall that the test was normal and stated that the only thing abnormal about the test was D.M.'s pain. Dr. Cameron additionally stated that nothing in the imaging tests demonstrated nerve root damage, and although there were some clinical indications of damage, they were not confirmed. He also expressed that the EMG's suggestion of radiculopathy was "very weak."

Dr. Cameron testified about Scheffey's charges for D.M.'s treatment. He testified that Scheffey's charges for interpreting the lumbar myelogram and for three initial comprehensive consultations were unjustified because the radiologist interpreted the myelogram and because a comprehensive consultation was performed when Scheffey first examined D.M. Dr. Cameron also found fault with Scheffey's coding and billing for procedures which were more complicated and expensive than the procedures actually performed. Ms. Towne testified that she believed the coding was a mistake; however, no attempt was made to correct the errors. Dr. Cameron testified that Scheffey's charges for the surgery were in excess of the usual and customary charges in the area and that Scheffey billed separately and additionally for procedures and follow-up visits that should have been included in the overall charge for the surgery.

Dr. Hall concluded that Scheffey performed surgery on D.M. without symptoms and physical findings to support the action. Dr. Cameron concluded that Scheffey over treated D.M. by performing unwarranted surgery, repeated his practice of unjustified charges, and improperly coded for procedures which yielded a higher rate of reimbursement.

## DISCUSSION

In reviewing the administrative decision of the Board, we use the substantial evidence scope of review defined under the Administrative Procedure Act. *See* Tex. Gov't Code Ann. § 2001.174(2)(E) (West 1997) (the "APA"). We must first consider whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency. *See Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989); *Wilmer–Hutchins Indep. Sch. Dist. v. Brown,* 912 S.W.2d 848, 852 (Tex.App.—Austin 1995, writ denied). We may not substi-

---

7. The diagnostic tests produced the following results:
   - MRI of lumbar spine—normal; no significant bulges or protrusions
   - EMG—suggested Sacral First Radiculopathy on the right side
   - Physical exam by Scheffey—tenderness across lumbosacral spine & into buttocks
   - Myelogram—normal
   - Post-myelogram CT Scan—slight bulging of L5–S1 disc
   - Discogram at L5–S1—negative
   - MRI of lumbar spine—negative; no evidence of disc herniation identified
   - Discogram—2cc's of contrast material injected at L4–5, none at L5–S1; disc space at L4–5 was unremarkable; pain radiating into legs with injection at L4–5; impression: abnormal study as noted above.

tute our judgment for that of the agency as to the weight of the evidence. *Public Util. Comm'n v. Gulf States Util. Co.,* 809 S.W.2d 201, 211 (Tex.1991); *see also* APA § 2001.174. Decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Texas Health Facilities Comm'n v. Charter Medical,* 665 S.W.2d 446, 453 (Tex.1984). If substantial evidence supports the Board's findings, we must resolve all conflicts in favor of the Board's decision, *see Wilmer–Hutchins,* 912 S.W.2d at 852, and uphold the Board's action if the evidence is such that reasonable minds could have reached the conclusion the Board must have reached in order to justify the suspension. *See Charter Medical,* 665 S.W.2d at 453.

Based upon its findings of fact, the Board concluded as follows:

\*     \*     \*     \*     \*     \*

(5) Based on Findings of Fact Nos. 15–335, Respondent has violated § 3.08(4)(G) of the Act in that he persistently and flagrantly overcharged or overtreated patients.

(6) Based on Findings of Fact Nos. 15–335 and Conclusion of Law No. 5, Respondent has engaged in dishonorable or unprofessional conduct that is likely to deceive or defraud the public or injure the public, a violation of § 3.08(4) of the Act.

(7) Based on Findings of Fact Nos. 15–335, Respondent has failed to practice medicine in an acceptable manner consistent with the public health and welfare, a violation of § 3.08(18) of the Act.

(8) Pursuant to § 4.01 of the Act, the Board has the authority to cancel, revoke, or suspend the license of any practitioner of medicine or impose any other authorized means of discipline upon proof of the violation of the Act in any respect.

(9) Based on the Findings of Fact and Conclusions of Law Nos. 5–8, any one of the violations is grounds for revocation or disciplinary action by the Board.

As the Board noted, any one of these violations would provide grounds for suspending Scheffey's license. *See* Act § 4.01(a); *Guerrero–Ramirez v. Texas Bd. of Medical Examiners,* 867 S.W.2d 911, 918 (Tex.App.—Austin 1993, no writ). This Court need only find substantial evidence supporting one ground for suspension in order to uphold the Board's order even if all three bases given by the Board are independently sufficient to support the suspension. *See* Act § 4.01(a); *Guerrero–Ramirez,* 867 S.W.2d at 918.

■ The first two bases for suspension of Scheffey's license related to his charging practices. In conclusion of law five, the Board determined that Scheffey violated the Act by flagrantly and persistently overcharging or overtreating his patients. In conclusion of law six, the Board determined that he had engaged in dishonorable or unprofessional conduct that was likely to deceive or defraud the public or injure the public, basing this violation upon the overcharging. *See* Act § 3.08(4). Even assuming that Scheffey overcharged his patients, to uphold the Board's decision, we must also determine that his overcharging was either flagrant or persistent.

The statute does not define what constitutes "persistently or flagrantly overcharging." *Id.* at 338; *see also* Act § 3.08(4)(G). This Court addressed the issue of persistent and flagrant overcharging in *Texas Bd. of Medical Examiners v. Birenbaum,* 891 S.W.2d 333 (Tex.App.—Austin 1995, writ denied), and defined "flagrant" as "extremely, flauntingly, or purposefully conspicuous; glaringly evident; notorious." We defined "persistent" as "continuing in a course of action without regard to opposition or previous failure; tenacious of position or purpose; existing for a long or longer than usual time or continuously." *Birenbaum,* 891 S.W.2d at 338. We must, therefore, ascertain whether Scheffey's charges were either (1) so excessive as to amount to extremely conspicuous or glaringly evident overcharging or (2) occurred so repetitively as to be tenacious or continuous. *Id.*

Even assuming the record contains substantial evidence that Scheffey flagrantly overcharged, we must also determine whether Scheffey "persistently overcharged." Such a determination requires a thorough examination of Scheffey's charges *across the whole spectrum* of his patients. *Id.* at 340. In *Birenbaum,* we determined that focusing on only seven complicated cases, while Birenbaum's practice included more than three hundred seventy-five patients, did not demonstrate "persistent" overcharging. *Id.* In this case, Scheffey's practice included 4500 patients; however, the Board focused on only four cases. Under the general definition of the term "persistent," this record does not contain substantial evidence to support the Board's finding that Scheffey persistently overcharged. Examining the evidence in the record, we agree with the district court that the record does not contain substantial evidence to support the Board's finding of persistent overcharging. Having determined that there is not substantial evidence to support a determination of persistent overcharging, it may not be said that the Board's findings of fact support conclusion of law five.[8]

In conclusion of law six, the Board determined that Scheffey engaged in dishonorable or unprofessional conduct that was likely to deceive or defraud the public or injure the public. *See* Act § 3.08(4). Flagrant or persistent overcharging under section 3.08(4)(G) is one method by which section 3.08(4) may be violated, and the Board expressly based conclusion of law six upon conclusion of law five. *See id.* § 3.08(4), .08(4)(G). Our determination that there is not substantial evidence to support conclusion of law five, therefore, necessitates the same result regarding conclusion of law six.

Scheffey insists that the Board's order must fail because conclusions of law five and six are not supported by substantial evi-

dence. However, we need only find substantial evidence supporting one ground for suspension in order to uphold the Board's order, especially in light of conclusion of law nine in which the Board expressly concluded that "any one of the violations is grounds for revocation or disciplinary action by the Board." *See* Act § 4.01(a); *Guerrero–Ramirez,* 867 S.W.2d at 918.

■ The Board's order stated a third basis for suspending Scheffey's license, focusing on Scheffey's treatment of patients rather than his charging of fees. In conclusion of law seven, the Board determined that Scheffey violated section 3.08(18) of the Act by failing to practice medicine in an acceptable manner consistent with the public health and welfare. *See* Act § 3.08(18). The Board heard testimony from Drs. Flatt, Hall, Cameron, and Sanders regarding Scheffey's operations on the four patients when surgery was not medically indicated. In each case, the experts noted that multiple diagnostic tests were performed but they gave only minimal, if any, indications for the procedures performed. Additionally, the doctors discredited the findings of several of the tests due to the possibility of varying interpretations.

While Scheffey presented experts who testified that the surgeries were medically indicated, if substantial evidence supports the Board's findings, we must uphold the Board's decision and resolve any conflicts in favor of the agency decision. *See Auto Convoy v. Railroad Comm'n,* 507 S.W.2d 718, 722 (Tex. 1974); *Wilmer–Hutchins,* 912 S.W.2d at 852. The question of what meaning, weight, and credibility to assign the conflicting evidence was a matter for the Board to determine; we are forbidden to make those assessments and are limited to the issue of whether the agency record as a whole demonstrates that the Board's assessments were reasonable. *See*

8. The Board determined that Scheffey violated section 3.08(4)(G) of the Act by flagrantly and persistently overcharging. *See* Act § 3.08(4)(G). Section 3.08(4)(G) of the Act states that it is a violation to flagrantly *or* persistently overcharge. *Id.* Even assuming there is substantial evidence to support a conclusion that Scheffey violated section 3.08(4)(G) by flagrantly overcharging, the Board's order specifically states in conclusion of

law five that Scheffey flagrantly *and* persistently overcharged. We must measure the sufficiency of the agency's order "by what it says" and not by judicial speculation about how the agency reached its final decision. *Morgan Drive Away, Inc. v. Railroad Comm'n,* 498 S.W.2d 147, 152 (Tex.1973); *Sensitive Care, Inc. v. Texas Dept. Human Servs.,* 926 S.W.2d 823, 828–29 (Tex. App.—Austin 1996, no writ).

APA § 2001.174(2); *Auto Convoy*, 507 S.W.2d at 722.

After hearing and weighing the testimony regarding the necessity of the surgeries performed by Scheffey, the Board determined that Scheffey failed to practice medicine in an acceptable manner consistent with the public health and welfare. We conclude that reasonable minds could have reached the conclusion that Scheffey overtreated his patients by performing surgery when surgery was not medically indicated and that there is sufficient evidence to support the Board's determination that Scheffey failed to practice medicine in an acceptable manner consistent with the public health and welfare. *See Sizemore*, 759 S.W.2d at 116; *Wilmer–Hutchins*, 912 S.W.2d at 852. Accordingly, we conclude that there was substantial evidence to support the Board's conclusion that Scheffey violated section 3.08(18) of the Act.

## CONCLUSION

Because we need only find substantial evidence supporting one ground for suspension in order to uphold the Board's order, we hold the record contains substantial evidence to support the Board's conclusion that Scheffey violated section 3.08(18) of the Act by failing to practice medicine in an acceptable manner consistent with the public health and welfare by performing surgery when it was not medically indicated. Based upon this violation, the Board could suspend Scheffey's license. Thus, we sustain the Board's point of error, reverse the judgment of the district court, and render judgment reinstating the decision of the Board.