# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00234-CV

**David L. Andrews, Appellant**

**v.**

**Texas Department of Health, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. GN501212, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The Texas Department of Health[1] revoked appellant David L. Andrews's respiratory care practitioner ("RCP") certificate. The district court affirmed the Department's decision and Andrews appeals. Andrews argues that the decision to revoke his certificate was not supported by sufficient evidence and that the administrative law judge ("ALJ") acted arbitrarily and capriciously by omitting or ignoring exculpatory witness testimony in his proposal for decision. Andrews asserts that he was improperly penalized for invoking his Fifth Amendment privilege. Finally, he contends that the Department's failure to comply with his request for a transcript of the hearing before he filed his administrative motion for rehearing was a violation of Texas law and a denial of his constitutional right to equal protection and due process. We affirm.

---

[1] While this case has proceeded, the Texas Department of Health was renamed the Texas Department of State Health Services. We will retain the previous name in the style for consistency and refer to the entity as "the Department."

Based on a complaint that Andrews improperly removed Fentanyl[2] from a patient's intravenous fluid ("IV") bag for his personal needs, the Department suspended Andrews's RCP certificate. At the ALJ's disciplinary hearing, the Department called seven witnesses and offered its investigation report into evidence. No one testified that they saw Andrews remove Fentanyl from an IV bag or found evidence of illicitly obtained Fentanyl in his possession or control. Witnesses testified that Andrews had a history of painkiller addiction, was using a prescribed Fentanyl patch when accused of removing Fentanyl from a patient's IV bag, and was seen handling a patient's Fentanyl IV bag in an unusual manner. A Fentanyl IV bag that was seen unpunctured shortly before Andrews handled it was seen to have been punctured shortly thereafter. Andrews declined to offer evidence and chose not to testify, asserting his Fifth Amendment right against self-incrimination.

The ALJ submitted a proposal for decision to the Commissioner of the Department to which Andrews filed objections. The Commissioner found the ALJ's proposal supported by a preponderance of the evidence, adopted the ALJ's proposed findings and conclusions, and denied Andrews's motion for rehearing. The district court affirmed the Commissioner's decision.

In reviewing the trial court's judgment affirming the Department's order, we use the substantial evidence standard of review defined in the Administrative Procedure Act. *See* Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2000) ("APA"). When reviewing an agency's decision, we presume that the order is supported by substantial evidence, and the person challenging the decision has the burden to overcome this presumption. *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.) (citing *Texas Health Facilities Comm'n v.*

---

[2] "Fentanyl is an extremely potent anesthetic, estimated to be a hundred times more potent than morphine on a milligram per milligram basis. It is the most commonly used narcotic analgesic . . . ." *Swayze v. McNeil Laboratories, Inc.*, 807 F.2d 464, 466 (5th Cir. 1987).

*Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)). We are concerned with the reasonableness of the administrative order and not its correctness. *See Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1996). The APA authorizes us to "test the agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole." *Texas Dep't of Pub. Safety v. Latimer*, 939 S.W.2d 240, 244 (Tex. App.—Austin 1997, no pet.) (citing *Charter*, 665 S.W.2d at 452). The agency determines the meaning, weight, and credibility to assign the conflicting evidence. *Texas State Bd. of Med. Exam'rs v. Scheffey*, 949 S.W.2d 431, 437 (Tex. App.—Austin 1997, pet. denied). We may not set aside an agency decision because testimony was conflicting or disputed or because it did not compel the agency's decision. *Brinkmeyer*, 662 S.W.2d at 956.

Substantial evidence does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact. *Hinkley v. Texas State Bd. of Med. Exam'rs*, 140 S.W.3d 737, 743 (Tex. App.—Austin 2004, pet. denied). The evidence in the record may preponderate against the agency's decision and nevertheless amount to substantial evidence.[3] *Latimer*, 939 S.W.2d at 244. A court reviewing an agency action "shall reverse and remand the cause to the agency when substantial rights of the appellant have been prejudiced by an agency's findings that are not reasonably supported by substantial evidence considering the reliable evidence in the record as a whole." *Hinkley*, 140

[3] Even if a litigant has arguably failed to meet their burden of proof before the agency, our review of the agency decision is limited by the substantial evidence rule. If there is substantial evidence supporting the decision, we must defer to the agency even if that evidence would not amount to a preponderance of the evidence.

3

S.W.3d at 743. If reasonable minds could have reached the conclusion that the agency must have reached, then that conclusion must stand. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988).

Andrews asserts that the Department's decision to revoke his RCP certificate was not supported by substantial evidence and asks this Court to reverse and remand his case for further proceedings. Andrews challenges the sufficiency of the evidence to support two findings of fact:

> 3. Shortly after midnight on February 2, 2004, Respondent tampered with and punctured a hole in an IV bag containing Fentanyl that was being administered to a hospital patient.
>
> . . . .
>
> 5. Respondent tampered with the IV bag containing Fentanyl to divert the narcotic for his personal needs and to the detriment of a patient.

He also challenges three conclusions of law based on these findings:[4]

> 4. The Respondent engaged in an activity that sought to meet his personal needs at the expense or to the detriment of a patient, as prohibited by 25 Tex. Admin. Code § 123.12(2)(G).
>
> 5. Based on Conclusion of Law No. 4 and 25 Tex. Admin. Code § 123.12(2)(G), Respondent's conduct was unethical.
>
> 6. Respondent committed dishonest or unethical conduct as contemplated by Tex. Occ. Code Ann. § 604.201(b)(4).

---

[4] We note that Andrews does not—as he did at the trial court—challenge the Department's conclusions of law 7, 8, and 9 to the effect that he violated occupations code section 604.201(b)(3) by improperly obtaining a habit-forming drug or narcotic, that the Department shall take disciplinary action against a person who engages in dishonest or unethical conduct as required by section 604.201(b), and that revocation of his certificate is warranted and justified.

4

Andrews declined to testify, call any witnesses, or submit any evidence. Thus, the record contains only evidence proffered by the Department.

Andrews began working at the University Hospital at San Antonio ("UHSA") as a respiratory care practitioner in November 2003. During January 2004, UHSA employees discovered that some of the patients' IV bags were missing Fentanyl. These discrepancies were found only with respect to patients located on the tenth floor of UHSA. The pharmacy department's investigation eliminated pump malfunction, defective bags, and documentation error as the causes for the shortages in Fentanyl. The abnormal IV bags were found to have small pin holes in them, raising suspicions of tampering. This further concerned UHSA staff because the holes added a risk of contamination or infection for the patients. Once tampering was determined to be the most likely cause of the discrepancies, the nurses at UHSA were instructed to closely monitor the Fentanyl IV bags and to check them hourly.

During the late evening hours of February 1, 2004, Andrews was in UHSA room 1026 until about 11:30 p.m. tending to a patient's respirator. Nurse Blasa Velez was in the room with Andrews from 10:45 p.m. until he left. Velez testified that Andrews was in room 1026 for an unusual amount of time. She checked the IV bag for leaks or holes once while she was in the room with Andrews and once at 11:50 p.m., after he left. At both times, she found no holes or leaks in the Fentanyl IV bag in room 1026. When leaving the room, Velez requested that other nurses monitor the room while she tended to other patients. Velez testified that, shortly after she left the room to tend to another patient, Andrews re-entered the room and handled the IV bag.

Shortly after midnight, nurses Lydia Gallegos, Maria Falcotelo, and Susan Robertson observed Andrews in room 1026 handling the patient's IV bag, which he had removed from the IV

pole. Gallegos testified that she saw Andrews holding the Fentanyl IV bag. Falcotelo called charge nurse Robertson to investigate when she saw Andrews handling the IV bag with tape on his fingers. Robertson testified that, when she arrived, Andrews had the IV bag off the pole in both of his hands. Robertson testified that Andrews hung the bag back on the pole, then got something off of the window sill and put it in his pocket. Gallegos testified that Andrews said that he was looking for the patient's name on the bag. As Robertson looked on, Gallegos also noticed that the bag was wet and asked Andrews about it. She held the bag up to the light and saw a small puncture in the bag. Andrews did not respond to Gallegos's question about the wetness, but instead left the room.

Gallegos testified that there is no reason for an RCP to handle a Fentanyl IV bag. Velez also testified that RCPs administer drugs through needleless syringes put into the ventilator. No one testified that they saw Andrews holding a needle syringe or puncturing the bag. Velez testified that it would be unusual for an RCP to find a patient's name by checking the IV bag because, on the way to the bag, the RCP would walk past a chart containing the patient's name, walk through a door that provides the patient's name, and walk past several nurses, each of whom would know the patient's name. Donnie Holman, the director of respiratory care at UHSA, testified that he had never seen anyone check an IV bag to identify a patient in his thirty years of healthcare employment.

Sergeant Sherrie King of the Bexar County Hospital District Police Department testified that she met Andrews at about 3:00 a.m., nearly three hours after Andrews left room 1026. King saw no needle marks on Andrews. Andrews consented to a search of his person and locker as well as to a urinalysis. It is undisputed that Andrews's urine sample would test positive for Fentanyl because he had been prescribed a Fentanyl patch following a severe automobile accident in 2003.

6

Andrews admitted that he had previously been prescribed a different pain-killing narcotic, OxyContin. Andrews told King that he checked himself into a rehabilitation clinic because his OxyContin prescription was too high of a dose and he became addicted. Additionally, King stated that Andrews acted a little strange during her interview with him. She testified that Andrews would look her in the eye when she asked him direct questions—for example, "what is your name?"—and would divert his attention and shift in his seat when asked about the IV bag incident. King also testified that her investigation focused on Andrews.

Falcotelo, Robertson, and pharmacy supervisor Javier Palacios testified that a puncture in the IV bag can be detrimental to the patient because it removes medication and opens what should be a closed system to the possibility of contamination or infection.

Andrews contends on appeal that the ALJ ignored or failed to mention evidence contrary to his findings of fact, thereby acting arbitrarily and capriciously. *See* Tex. Gov't Code Ann. § 2001.174(2)(F). However, the ALJ did mention in his proposal for decision almost all of the evidence Andrews complains is missing. The only evidence Andrews relies on that was not mentioned in the proposal for decision is King's testimony that she investigated only Andrews regarding tampering with this particular Fentanyl bag. In light of the balance of the evidence, this omission is not material. The remainder of the evidence that Andrews complains about—e.g., restraints obscuring ID bracelets, Andrews's cooperation in the investigation, absence of direct evidence that he punctured the bag or took the Fentanyl—is included in the narrative portion of the proposal for decision. The ALJ could have declined to include this conflicting information in his findings and conclusions because he either rejected it or deemed it irrelevant. This is not error, but

7

is the essence of winnowing findings from a body of evidence and then applying relevant law to make findings and reach conclusions.

After hearing and weighing the testimony and other evidence, the ALJ determined that Andrews tampered with an IV bag containing Fentanyl to the detriment of a patient, and did so in order to divert the narcotic for his personal needs. Although no witness testified to seeing Andrews use a syringe to extract Fentanyl from the IV bag in room 1026, evidence showed: that the bag was intact before he was seen handling it with tape on his fingers; that the bag was punctured and wet after he handled it; that handling the bag to determine the patient's name was unusual behavior for an RCP; and that he was seen taking "something" from the window sill and putting it in his pocket before leaving. Although no one found the Fentanyl or anything else that Andrews removed from room 1026, neither he nor his locker were searched for a number of hours after the incident. There was no dispute that removal of Fentanyl in this manner is detrimental to a patient. Nor is there any dispute that Andrews had a history of overusing painkillers and was at that time prescribed Fentanyl. We conclude that substantial evidence supports the ALJ's findings that Andrews tampered with the IV bag to a patient's detriment in order to divert Fentanyl for his personal use.

We conclude that the ALJ reasonably could have reached the conclusions that Andrews acted dishonestly and unethically and that his conduct was undertaken to further his personal needs to the detriment of his patient.

Andrews complains that the ALJ recommended suspension of his certificate even after expressly noting that there was no evidence on many of the eleven factors required to be considered in a disciplinary proceeding brought against a Respiratory Care Practitioner. *See* 25 Tex.

Admin. Code § 123.14(f)(4) (2006). That section requires that the Department "take into consideration the following factors in determining the appropriate action to be imposed in each case." *Id*.[5] It does not require that the ALJ make affirmative findings as to each factor. The ALJ listed these factors and discussed many of them, if only to note the lack of evidence concerning some of them. He nevertheless concluded that tampering with a patient's medication for the purpose of obtaining a narcotic for personal use is serious enough to warrant revocation of the RCP certificate. We cannot conclude that this recommendation was unreasonable, arbitrary, or capricious.[6]

In his second issue, Andrews contends that his constitutional rights were violated in two ways. He complains that he was improperly penalized for invoking his Fifth Amendment privilege against self-incrimination. He also argues that the Department's failure to supply him with

---

[5] The factors to be considered include:

(A) the severity of the offense;
(B) the danger to the public;
(C) the number of repetitions of offenses;
(D) the length of time since the date of the violation;
(E) the number and type of previous disciplinary cases filed against the respiratory care practitioner (RCP);
(F) the length of time the RCP has performed respiratory care procedures;
(G) the actual damage, physical or otherwise, to the patient, if applicable;
(H) the deterrent effect of the penalty imposed;
(I) the effect of the penalty upon the livelihood of the RCP;
(J) any efforts for rehabilitation; and
(K) any other mitigating or aggravating circumstances.

25 Tex. Admin. Code Ann. § 123.14(f)(4) (2006).

[6] We reach this conclusion without regard to whether the ALJ was entitled to draw a negative inference from Andrews's invocation of his Fifth Amendment right not to testify. We conclude that, even without such an inference, the record contained substantial evidence supporting the ALJ's findings, conclusions, and recommendation.

9

a transcript of the ALJ's hearing before the deadline for filing a motion for rehearing passed deprived him of equal protection and due process.

Andrews argues that, because he faced an ongoing criminal investigation, he was entitled to invoke his Fifth Amendment right in this civil administrative proceeding without any negative inference being drawn. At the hearing on the merits, Andrews's attorney told the ALJ that Andrews would not testify because he "reserves the right to decline to testify on the grounds that any answer he may give may tend to incriminate him in the existing criminal prosecution." The ALJ advised that, "if a party declines to testify in a civil proceeding such as this then an inference may arise that if he testified truthfully, it might be adverse to his position." *See* Tex. R. Evid. 513(c). Andrews declined to testify and rested without proffering any evidence. The ALJ opined in his proposal for decision that he could draw an adverse inference from Andrews's assertion of his Fifth Amendment privilege. Andrews contends that the negative inference was improper because he invoked his Fifth Amendment right not to incriminate himself in the pending criminal investigation into the disappearance of Fentanyl from UHSA and, therefore, should be able to invoke the privilege in this civil proceeding without adverse effect.

The ALJ was entitled to draw a negative inference from Andrews's failure to testify without regard to the applicability of the Fifth Amendment privilege. Generally, the exercise of the privilege should not be penalized. *Texas Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995). In a civil case, a fact-finder may draw reasonable inferences from a party's assertion of the privilege against self-incrimination. *Lozano v. Lozano*, 52 S.W.3d 141, 150 (Tex. 2001); *Denton*, 897 S.W.2d at 760. Further, Andrews declined to testify without properly invoking his Fifth Amendment right not to incriminate himself under oath. *See Texas Dep't of Pub. Safety*

10

*v. Sanchez*, 82 S.W.3d 506, 513 (Tex. App.—San Antonio 2002, no pet.). Blanket assertions of the privilege are improper. *Id*. The privilege must be asserted in response to a specific inquiry so that a judge may evaluate whether an answer to the question would tend to incriminate the witness. *Id*. Failure to invoke the privilege in this manner waives the privilege. *Id*. In *Sanchez*, the court considered a case in which the defendant in a driver's license suspension case wanted to testify in a limited fashion. *Id*. at 509. The ALJ warned him that testifying would expose him to cross-examination on any relevant matter, and that a refusal to testify could result in all of his testimony being struck. *Id*. at 512. Sanchez apparently persuaded the trial court that the ALJ thereby improperly refused to let him exercise his Fifth Amendment right not to testify against himself, and thus prevented him from testifying. In reversing the trial court's judgment and reinstating the ALJ's decision, the court of appeals wrote:

> It is clear then, that to properly invoke his privilege against self-incrimination, Sanchez was required to take the stand and assert the privilege in response to each question he believed might tend to incriminate him. Only then would the trial court have had the opportunity to determine whether the privilege applied. Without doing so, Sanchez waived any complaint that the ALJ violated his privilege against self-incrimination.

*Id*. at 513 (citing *Gebhardt v. Gallardo*, 891 S.W.2d 327, 330 (Tex. App.—San Antonio 1995, no writ)). Similarly, in this case, Andrews undisputedly was not called to testify, did not assert the privilege in response to specific questions, and did not personally assert the privilege. Instead, Andrews chose not to present evidence or testify, expressing the latter intent through counsel at the ALJ's hearing.

11

When a party with special knowledge of a disputed issue fails, without explanation, to testify about that issue, a judge may infer that the party knew its testimony would not support its claim. *Thompson v. Deloitte & Touche, L.L.P.*, 902 S.W.2d 13, 18 (Tex. App.—Houston [1st Dist.] 1995, no writ). Andrews had special knowledge of whether he tampered with the IV bags and explained his refusal to testify only through his counsel's attempts to invoke the privilege not to testify. The ALJ was entitled to draw a negative inference from Andrews's choice not to testify. *See id.*

Finally, Andrews asserts that the Department's failure to comply with his request for a transcript of the ALJ's hearing on the merits deprived him of his constitutional right to equal protection and due process. The ALJ's hearing was recorded on tape and the ALJ used excerpts from the testimony in support of his proposal for decision. When Andrews filed exceptions to the proposal for decision, he requested that the hearing be transcribed and that the transcript be forwarded to the Department along with the ALJ's proposal for decision. After the Department adopted the proposal for decision, Andrews filed a motion for rehearing that included his complaint that the transcription would not be prepared and available to him until after his appeal was filed. He complained to the Department, as he does here, that the absence of a transcript prevented him from filing an adequate motion for rehearing in order to lay the groundwork for his suit for judicial review. The ALJ's hearing was not transcribed until after he filed his suit for judicial review.

Andrews has not demonstrated that the failure to transcribe the hearing before he filed this suit deprived him of equal protection. *See* Tex. R. App. P. 44.1(a). A claim of deprivation of equal protection rights requires a showing that an individual was treated differently from others similarly situated. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). Andrews, however, has not shown that

his record preparation schedule was different from that of any other individual going through an administrative procedure, before the Department or otherwise.[7]

Nor has Andrews shown that he was denied due process in any way that harmed him. The statute under which he requested a transcription of the hearing does not require that the transcription be prepared before the motion for rehearing is due. *See* Tex. Gov't Code Ann. § 2001.059 (West 2000). Even if due process required that he have a transcription of the hearing in time to prepare his motion for rehearing to the Department, Andrews has not shown either that the absence of a transcript at the time he prepared his administrative motion for rehearing probably caused the rendition of an improper judgment or that he was either prevented from presenting any argument to the trial court or this Court. Consequently, he has shown no reversible error from any deprivation of due process. *See* Tex. R. App. P. 44.1(a).

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: February 15, 2007

_____

[7] Andrews may be arguing that he was treated differently from the ALJ because the ALJ had access to the hearing tapes when preparing the proposal for decision. But this argument lacks an essential element of an equal protection claim because, as a litigant, Andrews is not "similarly situated" to an ALJ, an impartial hearing officer. Further, there is no showing that Andrews was denied access to something the ALJ had—i.e., there is no showing that the ALJ denied Andrews access either to the recordings of the hearing or a prepared transcription thereof.