# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00494-CV

**Bruce Stanton Hinkley, M.D., Appellant**

**v.**

**Texas State Board of Medical Examiners, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
## NO. GN003663, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

Dr. Bruce Stanton Hinkley appeals the district court's judgment affirming the decision of appellee, the Texas State Board of Medical Examiners (the "Board"), to revoke his license to practice medicine. Hinkley asserts by several specific issues that the Board's decision was not supported by substantial evidence, was arbitrary and capricious, was affected by other errors of law, and violated Hinkley's constitutional or statutory rights. We affirm the judgment of the district court.

## BACKGROUND

In 1989, after acknowledging that he was addicted to cocaine, Hinkley entered into an Agreed Order with the Board that revoked Hinkley's medical license but stayed the revocation by placing him on probation for ten years. The terms of his probation required that he refrain from

the use, possession, administration, or prescribing of any controlled substance; submit himself to random alcohol and drug screening; and participate in psychiatric evaluation. After Hinkley had served four years of his probation, the Board agreed to modify the Agreed Order to allow Hinkley to reapply to the Drug Enforcement Administration and the Texas Department of Public Safety for Controlled Substance Registration so he might regain the ability to write prescriptions for controlled substances.

In 1998, after he had served nearly nine years of his ten-year probation, Hinkley provided three urine samples that tested positive for the presence of bezodiazepine, a chemical that indicates the use of a prohibited substance. Hinkley and the Board entered into an Agreed Order which prohibited Hinkley from treating patients until he personally appeared before the Board. Three weeks later, Hinkley presented evidence to a representative for the Board that called into question the chain of custody of the samples. There was also some evidence that the samples in question did not contain Hinkley's DNA. Hinkley, furthermore, provided negative urine test results from a different lab taken on the same days as the positive tests. Hinkley also offered contradicting evidence regarding his alleged drug use through testimony of his psychiatrist and work colleagues.

The Board determined that the chain of custody was not properly documented but decided to extend Hinkley's probation for five years. The Agreed Order was modified to continue the terms of Hinkley's probation and require that he refrain from the consumption of alcohol, dangerous drugs, or controlled substances. Thereafter, Hinkley was frequently subjected to random urine tests. The record shows that he provided over 400 urine samples in a seventeen-month period from February 1998 to June 1999.

On March 30 and again on June 28, 1999, Hinkley provided urine samples that tested positive for the presence of cocaine metabolite. The Board issued an order suspending Hinkley's medical license effective July 26, 1999. In November 1999, the Board filed a complaint with the State Office of Administrative Hearings seeking revocation of Hinkley's medical license. In February 2000, an administrative law judge held a contested case hearing on the matter.

At the hearing, Hinkley provided testimony of several colleagues and his own psychiatrist to the effect that his performance as a surgeon and his general comportment were not indicative of drug use. Hinkley also provided testimony from an expert witness, Dr. Kent Allen Holtorf. Holtorf is a certified Medical Review Officer (MRO), a certification provided by the federal Department of Health and Human Services authorizing him to interpret positive tests under federal testing programs. MROs have the responsibility of determining whether an alternate explanation exists for a positive drug test. Holtorf testified there were plausible explanations for Hinkley's positive drug tests that negated any deliberate use by Hinkley. Holtorf testified that the two samples in question had a very low presence of cocaine metabolite and that the most cocaine Hinkley could have ingested was one third the amount of cocaine necessary to cause any euphoric effect.[1] He also testified that the samples indicated that Hinkley had been very dehydrated on the dates in question

---

[1] Holtorf indicated that because Hinkley was being tested so often, it was possible to determine the maximum level of cocaine that could have been in Hinkley's body that would have yielded the amount of cocaine metabolite appearing in his urine samples.

and that if this factor had been taken into account when interpreting the tests, the tests would not have been deemed positive.[2] Holtorf concluded that the test results were "very consistent with and more than likely due to either passive inadvertent exposure causing the positive, or to something other than cocaine being—resulting in a positive test."

Holtorf then suggested various ways in which such passive inadvertent exposure could have occurred. Fixing upon testimony that Hinkley had allowed recovering drug addicts to stay in his home as part of his own drug recovery program, Holtorf surmised that these recovering addicts could have used Hinkley's kitchen to cook cocaine, either on the stove or in the microwave, and that residue from the cooked cocaine could have gotten on Hinkley's hands, could have been inhaled by Hinkley, or could have been inadvertently ingested. Holtorf cited several studies from medical journals indicating that passive exposure to cocaine can result in urine samples that show cocaine metabolite. He added that a cream that Hinkley used for his arthritis could aid the dermal absorption of cocaine.

Holtorf also criticized the testing method used on Hinkley's samples, the three ion test, as not the best indicator of drug use. According to Holtorf, the three ion test is more sensitive than the alternative full spectrum testing method and is not engineered to definitively recognize illegal substances. Holtorf suggested that the three ion test could have found another substance that

---

[2] Holtorf added that over-hydration is a common method of "beating" drug testing, suggesting that Hinkley's dehydrated state belied drug usage.

was not cocaine but molecularly resembled cocaine. Holtorf supported his theory with several studies that showed the three ion test had incorrectly "flagged" legal substances.

The Board relied on two chief witnesses, Dr. Anthony Costantino and Sybil Lowry. Neither are medical doctors and neither are certified medical review officers. However, Constantino holds a Ph.D. in forensic toxicology and has worked with various entities performing drug tests for nearly twenty years. Lowry holds a Masters of Science degree in food chemistry and microbiology and has practiced in the field of toxicology, performing drug tests for nine years. Hinkley objected to both witnesses on the grounds that they were not qualified to testify as to the interpretation of the drug samples because neither are MROs. The ALJ overruled Hinkley's objection. Both Constantino and Lowry testified that the urine samples in question had tested positive for cocaine metabolite. Lowry testified that the tests showed that Hinkley "somehow took cocaine into [his] body." Constantino testified that the tests indicated that Hinkley had ingested cocaine and that passive inadvertent ingestion could not account for the results of Hinkley's tests.[3]

---

[3] Constantino testified:

Q: You can't actually tell whether they used it or not, can you? All you know is they were exposed to it; isn't that correct?

A: Well, applying these cutoffs, it's my belief and understanding that for it to appear in the person's urine they would have had to ingest it. And applying these cutoffs, the argument of passive inhalation doesn't apply.

Q: Because of the cutoffs?

A: Yes. And we are talking about passive inhalation, if I may, we're not talking about an incidental exposure, we're talking about a concentrated prolonged exposure in an environment where an individual that can see and think would know what they were being exposed to, and they would stay in the

5

On June 20, 2000, the ALJ issued a Proposal for Decision recommending that Hinkley's license be revoked. Hinkley filed exceptions to the Proposal for Decision. One of his exceptions concerned the ALJ's conclusion that "[t]he only reasonable conclusion from this finding about the chain of custody problems [referring to the 1998 tests] is that the Board allowed the Respondent the benefit of the doubt." The ALJ filed an Amended Proposal for Decision wherein she deleted the above quoted sentence but again recommended that the Board revoke Hinkley's medical license. On October 20, 2000, the Board voted to adopt the ALJ's amended recommendation and revoked Hinkley's medical license. Hinkley filed a motion for rehearing, which was denied. Hinkley then sought judicial review in district court. The district court affirmed the Board's decision. Hinkley now appeals to this Court.

## STANDARD OF REVIEW

Our review is guided by the familiar standards of review under the Administrative Procedures Act (APA). *See* Tex. Gov't Code Ann. § 2001.174 (West 2000); *Texas State Bd. of Med. Exam'rs v. Scheffey*, 949 S.W.2d 431, 435 (Tex. App.—Austin 1997, writ denied). We

(1) may affirm the decision of the agency in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of constitutional or statutory provisions;

---

presence of it for a prolonged period of time, and they would do so in a poorly ventilated area where the vapors could concentrate.

6

* * *

    (D)  affected by other error of law;

    (E)  not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

    (F)  arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174.

Under the APA's "substantial evidence" test, a court reviewing an agency action shall reverse and remand the cause to the agency when substantial rights of the appellant have been prejudiced by an agency's findings that are not reasonably supported by substantial evidence considering the reliable evidence in the record as a whole. *Id.* § 2001.174(2)(E). We may not substitute our judgment for that of the agency regarding the weight of the evidence; we must, however, test any disputed finding of basic or underlying fact against that body of evidence. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ). The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable "in light of the evidence from which they were purportedly inferred." John E. Powers, *Agency Adjudications* 163 (1990). "[Substantial evidence] does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" of fact. *Lauderdale*, 923 S.W.2d at 836 (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988)). Therefore, we will sustain an agency's finding if reasonable minds could have reached the same conclusion. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988).

7

An administrative decision is generally not arbitrary and capricious if it is supported by substantial evidence. *Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966). However, "instances may arise in which the agency's action is supported by substantial evidence, but is arbitrary and capricious nonetheless. One such instance is when a denial of due process has resulted in the prejudice of substantial rights of a litigant." *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 454 (Tex. 1984). An agency abuses its discretion in reaching a decision if it omits from its consideration factors that the legislature intended the agency to consider, includes in its consideration irrelevant factors, or reaches a completely unreasonable result after weighing only relevant factors. *Texas Health Enters. v. Texas Dep't of Health*, 954 S.W.2d 168, 173 (Tex. App.—Austin 1997, no pet.) (citing *Statewide Convoy Transps., Inc. v. Railroad Comm'n of Tex.*, 753 S.W.2d 800, 804 (Tex. App.—Austin 1988, no writ)). This Court must presume that the order is valid, and the burden of proving otherwise is on the appellant. *Id.*

## DISCUSSION

Hinkley asserts that the Board's decision to revoke his medical license was not supported by substantial evidence, was arbitrary and capricious, was affected by other errors of law, and violated Hinkley's constitutional or statutory rights. He bases his substantial evidence complaints on evidence presented at the contested-case hearing before the ALJ: (1) the testimony of Hinkley's colleagues and psychiatrist that Hinkley did not fail to abstain from the use of cocaine; (2) "uncontroverted" scientific evidence that provided an alternative explanation for the positive results; and (3) evidence suggesting that the kind of urine testing used in Hinkley's case is not scientifically reliable. Hinkley's arbitrary and capricious complaints, which overlap with his

8

complaints regarding other errors of law and constitutional or statutory violations, are based on the following contentions: (1) the Board's testifying witnesses concerning the interpretation of Hinkley's urine sample were unqualified because they were not certified MROs; (2) the ALJ improperly shifted the burden of proof to Hinkley to show that he had not failed to abstain from cocaine use; (3) the ALJ improperly raised a *Daubert* challenge to Hinkley's expert *sua sponte*; (4) the Board erred in considering the 1998 tests that had previously been invalidated by the Board; and (5) the Board erred in denying Hinkley's request for extended oral argument.

**Substantial evidence complaints**

Hinkley argues that the Board's decision to revoke his medical license is not supported by substantial evidence. Again, under the substantial evidence standard of review, we must ask only whether the evidence in its entirety is sufficient that reasonable minds could have reached the conclusion that the agency must have reached to justify the disputed action. *Sizemore*, 759 S.W.2d at 116. The evidence in the record may actually preponderate against the agency's decision but still satisfy the substantial evidence requirement. *Charter Med.-Dallas*, 665 S.W.2d at 452.

Here, the ALJ had scientific evidence that two of Hinkley's urine samples tested positive for cocaine, and she had at least one expert witness definitively testify that the tests foreclosed the possibility of ingestion by inadvertent passive exposure.[4] Hinkley relies on evidence offered to contradict the Board's evidence, including the testimony of Hinkley's colleagues and his

---

[4] Hinkley's challenges to the admissibility of the testimony of two Board witnesses who interpreted his positive tests are addressed below.

personal psychiatrist that Hinkley did not fail to abstain from the use of cocaine, scientific evidence providing an alternative explanation for the positive results, and evidence indicating that the kind of urine testing used in Hinkley's case is not scientifically reliable. We do not weigh the evidence but only ask whether the ALJ's conclusion was reasonable.

The testimony of Hinkley's colleagues and psychiatrist is probative but not conclusive. Even if it did not appear to *them* that he had started using cocaine again, their observations do not necessarily foreclose the possibility. As the ALJ observed, those witnesses were not with Hinkley at all times. As to the testimony that provided alternative explanations for the positive results, as the fact finder, the ALJ could find, as she did, that the alternative explanations provided by Holtorf were not credible or were not pertinent to Hinkley. As to the evidence that called into question the scientific reliability of the three ion testing method used on Hinkley's urine samples, the Board provided evidence showing that the three ion testing method is the method of choice throughout Texas, as well as evidence showing that the labs that tested Hinkley's samples are monitored by a federal agency that has concluded that the labs have never reported a false positive. Based on the two positive urine tests and the expert witness testimony explaining the import of those tests, we cannot conclude that the ALJ's conclusion was unreasonable. We overrule Hinkley's substantial evidence issue.

**Arbitrary and capricious complaints**

### *Challenge to the Board's experts*

Hinkley asserts that the Board's witnesses, Constantino and Lowry, were not qualified to testify as to the interpretation of his positive drug tests. *See Daubert v. Merrell Dow*

*Pharm.*, 509 U.S. 579 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995). The sole basis of this challenge is that the witnesses were not MROs. Hinkley correctly asserts that, according to federal standards of drug testing established by the National Institute on Drug Abuse, a positive drug test must be reviewed by a MRO. 49 C.F.R § 40.123 (2004). Texas does not have a similar standard and there is no merit to Hinkley's assertion that the Board witnesses categorically must be MROs to be qualified. Although the ALJ could have considered the testimony of a MRO to be stronger expert testimony, that does not mean that the testimony the Board's witnesses offered failed to qualify as expert testimony under *Daubert/Robinson* standards. We overrule Hinkley's issue.

### Burden shifting

Hinkley also contends that the ALJ improperly shifted the burden of proof so as to require him to affirmatively disprove he had failed to abstain from drug use. Hinkley points to the ALJ's mention in her Recommendation that, among other things, Hinkley failed to: "controvert and [] explain[] away" the positive tests through credible evidence. Viewed in its proper context, we do not regard this statement as suggesting the ALJ shifted the burden of proof to Hinkley to disprove the allegations against him. The ALJ was weighing Hinkley's evidence against contrary evidence of two positive drug tests that indicated ingestion of cocaine. The ALJ's statement appears merely to evince her view that the Board's evidence met its burden and that Hinkley did not adduce evidence tipping the scales back in his favor. This is a reasonable conclusion from the evidence and, as the fact-finder, it was the ALJ's prerogative to view the evidence in that manner. Her statements do not show that she improperly shifted the burden of proof against Hinkley. We overrule Hinkley's issue.

11

**Sua sponte Daubert *challenge of Hinkley's expert***

Hinkley contends that the ALJ improperly raised a *Daubert/Robinson* challenge to Hinkley's expert *sua sponte*. *See Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805 (Tex. 2002). Hinkley relies on statements by the ALJ that "[d]espite his impressive credentials, Holtorf's testimony lacked credibility," which, in her view, stemmed from there being "little or no underlying factual evidence to support his conclusion that Hinkley's drug tests . . . were more likely than not due to either inadvertent passive exposure or to something other than cocaine being ingested." We are unpersuaded by Hinkley's argument. We interpret the ALJ's statements to be explanations as to why she did not find Holtorf's testimony credible. The ALJ had experts on both sides arguing opposite points; it was her job to determine which expert to believe. *See Raymond v. Rahme & Williams Invs.*, 78 S.W.3d 552, 555-56 (Tex. App.—Austin 2002, no pet.). We do not conclude that the ALJ acted in an arbitrary or capricious manner in her determination on this point. We overrule Hinkley's issue.

### 1998 positive drug tests

Hinkley argues that the Board erred in considering the 1998 positive drug tests in its 2000 decision. Hinkley asserts that although the Board attorney had conceded in the contested-case hearing before the ALJ that the 1998 tests were not in issue, the Board attorney in the hearing before the Board stated that Hinkley had submitted "five urine samples which have all tested positive for cocaine. Three in 1998. In 1998, you gave him the benefit of the doubt and allowed him to continue to practice medicine." Hinkley contends that this argument was improper because it gave the Board

12

the inaccurate impression that five positive tests were at issue instead of two. Hinkley argues that if the Board made its 2000 decision under an incorrect assumption, then that decision was arbitrary and capricious.

The Board responds that at the time that the Board attorney made the improper argument, Hinkley's attorney posed a lengthy objection to the Board attorney's reference to the 1998 tests. Hinkley's attorney stated in part:

> [T]here have been about three or four serious misstatements that need to be corrected on the record. The first one was that Dr. Hinkley has five dirty urines. That—and then there's great argument about 1998 and Dr. Hinkley was given the benefit of the doubt. Look at the 1998 order. It was disputed. In this case, Mr. Rick Wooton [Board counsel at the ALJ hearing] stood up before ALJ Smith and said 'the 1998's aren't in issue.' I raised that as an exception. ALJ Smith on October the 18th, 2000 changes the language in her letter of October 18th, 2000. 'Based on the exception in the first paragraph, I've deleted the last sentence on Page 9 of the proposal.' That sentence read 'the only reasonable conclusion from this finding about the chain of custody problems is that the Board allowed the Respondent the benefit of the doubt, Respondent reads too much into this sentence. It's an unnecessary part of the decision." That's my whole beef. The 1999 stuff is in the case and then it's not in the case when the ALJ decides it, and now it's back in the case when you want to take away his license. That is absolutely wrong. We have two contested urines before you today, only 1999 only [sic] in issue . . . .

The Board contends that the improper argument was cured by Hinkley's objection and further that there is no evidence that the Board improperly relied on the 1998 tests in any other manner in making their decision.

We have previously held there is no reversible error where improper argument is made before an administrative board but counsel is present to object to the improper argument and there is no indication that the administrative board thereafter allowed the improper argument to

13

continue. *See Hunter Indus. Facilities v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 96, 110 (Tex. App.—Austin 1995, writ denied). Ultimately in this case, the Board adopted the recommendation of the ALJ, and Hinkley did not complain in his appeal that the ALJ improperly relied on the 1998 tests. We do not find reversible error on the facts before us. We overrule Hinkley's issue.

### *Oral argument extension*

Hinkley asserts that the Board abused its discretion in refusing him an extension of oral argument before the Board.[5] We review Hinkley's issue by an abuse of discretion standard. *Texas Health Enters.*, 954 S.W.2d at 173. Hinkley requested orally and in writing that he be allowed an hour of oral argument "due to the severity of the proposed sanction and the serious medical, scientific and legal issues raised."

The Board responds that the rule in effect at the time did not specify the amount of time allotted for oral argument before the Board. It instead stated that, "oral argument shall be allowed only in the sound discretion of the Board." 22 Tex. Admin. Code 187.33, effective Sept. 2002 (repealed Jan. 2002). Although we agree with Hinkley's assertion that the issues before the Board were serious, we conclude that the Board had the discretion to choose whether or not to allow oral argument. In this case, Hinkley had provided the Board with sixty-six pages of single-spaced "Exceptions" in which he extensively argued his case. Further, when the Board asked Hinkley's attorney if he intended to present anything in oral argument that was not also in the document,

---

[5] It is not clear from the record how much time Hinkley was given for oral argument.

14

Hinkley's attorney responded, "[t]here is nothing that we intend to present beyond that document except that as I understood it the Board would make an opening and we would respond . . . ." It is not an abuse of discretion on these facts for the Board to deny Hinkley's request for extended oral argument. We overrule Hinkley's issue.

## CONCLUSION

We affirm the judgment of the district court affirming the Board's decision to revoke Hinkley's medical license.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Patterson and Pemberton

Affirmed

Filed:   June 10, 2004

15