# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

<hr>

## NO. 03-05-00469-CV

<hr>

**Texas Department of Family and Protective Services, Appellant**

**v.**

**Jennifer Barlow, Appellee**

<hr>

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT**
**NO. GN401059, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

<hr>

## M E M O R A N D U M   O P I N I O N

<hr>

The Department of Family and Protective Services[1] appeals from a final judgment of the district court reversing its order that Jennifer Barlow was a person responsible for the "neglect" of children whose name should be placed on the Department's central registry of "designated perpetrators" of child neglect. The district court held that the Department's order was not supported by substantial evidence. We affirm the district court's judgment.

<hr>

[1] During the pendency of the proceedings below, the agency's name was changed from the Department of Protective and Regulatory Services to the Department of Family and Protective Services. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 198, §§ 1.27, .29, 2003 Tex. Gen. Laws 641, 642 (effective Feb. 1, 2004). We will use its current name or, simply, "the Department."

## BACKGROUND

At relevant times, Barlow was a case manager for a private child-placing agency licensed by the Department, For Children's Sake.[2] For Children's Sake maintained relationships with certain foster homes, and would place foster children in those homes. Barlow oversaw the care and condition of foster children assigned to her during their placements in the agency's foster homes. On August 3, 2003, one of the foster children assigned to her—an eight-year-old boy, K.M.—sexually "acted out" on another, J.L., a four-year-old boy, during their temporary respite placement in the foster home of Isabel and Don Barron. Ms. Barron discovered the pair in bed and found K.M., his pants down, with an erection, on top of J.L., who was clothed. A second four-year-old boy, A.A., was sitting in the room.

This incident was reported to the Department, which is charged with investigating reports of alleged child "abuse" or "neglect" by "person[s] responsible for a child's care, custody or welfare." Tex. Fam. Code Ann. § 261.301(a), (e) (West 2002).[3] Child "abuse" and "neglect," as well as "person[s] responsible for a child's care, custody or welfare" within the Department's jurisdiction, are defined in section 261.001 of the family code. *Id*. § 261.001(1), (4), (5) (West 2002). If the Department staff concludes, by a preponderance of the evidence, that an individual "is responsible for abuse or neglect of a child for whom that person has responsibility for

[2] *See* Tex. Hum. Res. Code Ann. § 42.041(a) (West 2001) (requirement of license to operate "child-care facility or child-placing agency."). A "child-placing agency" is "a person, including an organization . . . who plans for the placement of or places a child in a child-care facility, agency foster home, agency foster group home, or adoptive home." *Id*. § 42.002(12) (West 2001).

[3] Unless otherwise indicated, our citations to code provisions are to the versions in effect at the time of the events relevant to the Department's proceeding against Barlow.

care, custody or welfare as defined by [family code] § 261.001(5)," it makes a "summary finding" that the individual is a "designated perpetrator" of the abuse or neglect. 40 Tex. Admin. Code § 700.512(b)(2) (2003).[4] Such a finding, unless overturned, has consequences that include the placement of information regarding the "designated perpetrator" of the "abuse" or "neglect" in the Department's central registry. *See* Tex. Fam. Code Ann. § 261.002 (West 2002); 40 Tex. Admin. Code § 700.104 (2003). This information would be disclosed to third parties, for example, whenever a child-care provider ran a required background check on a prospective hire. *See* 40 Tex. Admin. Code §§ 745.611, .615 (2003).

Initially, the Department did not assign the incident report as a potential abuse or neglect investigation. It did so, however, after additional information came to light that, as the Department's representative put it, "this was not just . . . the average eight-year-old playing . . . doctor or whatever with a four-year-old," but "this eight-year-old had an extensive history of sexually acting out with other children and his siblings." The Department's staff began to investigate the incident as involving possible neglectful supervision of the children.[5] The Barrons, the foster parents, were initially identified as "alleged perpetrators," or suspected as being responsible for the alleged neglectful supervision. 40 Tex. Admin. Code § 700.521 (2003). The incident, the parties agree, occurred one morning after Isabel Barron had left K.M., J.L., and three other foster children unattended while they ate breakfast in the kitchen, and retired to her bedroom and master bathroom,

----

[4] The Department's staff assigns this "role" after making the "summary finding" of "reason-to-believe" that the abuse or neglect occurred. 40 Tex. Admin. Code §§ 700.511(b)(1), .512(b) (2003).

[5] Because K.M. was only eight years old, the Department did not investigate the child as an "alleged perpetrator." *See* 40 Tex. Admin. Code § 700.512(a)(1) (2003).

3

closed her door, and prepared for the day. Five to ten minutes later, Ms. Barron later heard sounds coming from a bedroom and discovered K.M. "acting out" with J.L., as described earlier.

As the investigation proceeded, however, the Department's focus shifted to Barlow based on assertions by the Barrons that Barlow never fully disclosed the full nature of K.M.'s behaviors to them or explained how to supervise him. Also significant to the Department was the fact that Barlow had learned, on the day before the incident, that the Barrons were permitting K.M. to share a bedroom with the two four-year-old boys. The Department's staff ultimately ruled out the Barrons but found "reason-to-believe" that Barlow was a "designated perpetrator" of "neglect" of both J.L. and K.M. *See id*. §§ 700.511(1) & (2), .512(2) (2003).

Barlow requested an administrative review of this determination, *see* Tex. Fam. Code Ann. § 261.309(c) (West 2002), which sustained the original findings. She then requested a "release hearing," a proceeding governed by the Administrative Procedures Act (APA) in which the Department had the burden to establish its administrative findings by a preponderance of the evidence. 40 Tex. Admin. Code §§ 700.601-.605 (2003). The Department referred the case to the State Office of Administrative Hearings, where a contested case hearing was held before an administrative law judge.

Following the hearing, as noted, the Department rendered an order sustaining its administrative findings. The district court reversed this order, finding that it was not supported by substantial evidence. The Department appeals.

4

**DISCUSSION**

The Department's order rested upon two ultimate legal conclusions, both of which were required to support its placing Barlow's name in the central registry: (1) that Barlow "was a person responsible for the care, custody, or welfare of K.M. and J.L., as set out in Tex. Fam. Code Ann. § 261.001(5)," and thus within the class of persons subject to having their names placed on the Department's central registry; and (2) that "[b]ased on the above Findings of Fact, the Department proved by a preponderance of the evidence that [Barlow] neglected a child, as neglect is defined by Tex. Fam. Code. Ann. § 261.001(4)." On appeal, the Department contends that substantial evidence supports both of these legal conclusions.

Whether the Department's order was supported by substantial evidence is a question of law. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000). The district court's judgment is thus not entitled to deference on appeal. *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal of that judgment, we consider the same question presented to the district court: whether the Department's order was supported by substantial evidence. *See Montgomery*, 34 S.W.3d at 562.

The APA authorizes courts to "test the agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole." *Texas Dep't of Pub. Safety v. Latimer*, 939 S.W.2d 240, 244 (Tex. App.—Austin 1997, no pet.) (citing *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)). We are to presume that the agency decision is supported by substantial evidence, and Barlow has the burden of

5

overcoming that presumption. *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.) (citing *Charter*, 665 S.W.2d at 452). We may not substitute our judgment for that of the Department, and may consider only the record on which the agency based its decision. *Id*.

The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable "in light of the evidence from which they were purportedly inferred." *Id*. (citing John E. Powers, *Agency Adjudications* 163 (1990)). Substantial evidence does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact. *Hinkley v. Texas State Bd. of Med. Exam'rs*, 140 S.W.3d 737, 743 (Tex. App.—Austin 2004, pet. denied). The evidence in the record may actually preponderate against the agency's decision and nevertheless amount to substantial evidence. *Latimer*, 939 S.W.3d at 244. The agency determines the meaning, weight, and credibility to assign conflicting evidence, *Texas State Bd. of Med. Exam'rs v. Scheffey*, 949 S.W.2d 431, 437 (Tex. App.—Austin 1997, pet. denied), and we may not set aside an agency decision because testimony was conflicting or disputed or because it did not compel the agency's decision. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1996). We are ultimately concerned with the reasonableness of the agency's order, not its correctness. *See id*.

A court reviewing an agency action "shall reverse and remand the cause to the agency when substantial rights of the appellant have been prejudiced by an agency's findings that are not reasonably supported by substantial evidence considering the reliable evidence in the record as a whole." *Hinkley*, 140 S.W.3d at 743; *see* Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2004).

6

We turn first to the Department's conclusion that "[b]ased on the above Findings of Fact, the Department proved by a preponderance of the evidence that [Barlow] neglected a child, as neglect is defined by Tex. Fam. Code. Ann. § 261.001(4)." Family code section 261.001(4) defines "neglect," in relevant part, as "failing to remove a child from a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in bodily injury or a substantial risk of immediate harm to the child." Tex. Fam. Code Ann. § 261.001(4)(B)(i). Consequently, the Department's finding of neglect requires substantial evidence of four elements: (1) a "situation"; (2) the "situation" is one "that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities"; (3) the "situation" results in bodily injury or "a substantial risk of immediate harm" to the child; and (4) the person failed to "remove" the child from the "situation." Regarding these elements, the Department made the following findings of ultimate fact:

18.     [Barlow's] failure to remove K.M. and J.L. from a situation in which they shared a bedroom and her failure to immediately insist upon appropriate supervision of K.M exposed these children to substantial risk of immediate harm.

19.     A person acting reasonably would have realized that failure to immediately remove K.M. and J.L. from the situation described in Finding 18 placed these children in a situation requiring judgment or actions beyond their level of maturity, physical condition, and mental abilities.

*See id.* Thus, as reflected in Finding 18, the relevant "situation" found by the Department was (1) J.L. and K.M.'s sharing of a bedroom; and (2) Barlow's "failure to immediately insist upon appropriate supervision of K.M." This situation, in turn, resulted in "substantial risk of immediate

7

harm" to J.L. and K.M., according to the Department. A "substantial" risk denotes one that is "actually existing; real; not seeming or imaginary; not illusive; solid; true; veritable." Black's Law Dictionary 1428 (6th ed. 1990). "Immediate harm" denotes harm resulting "[n]ext in line or relation; directly connected; not secondary or remote" from the "situation." *See id*. at 749. The term also has temporal connotations, "either instantly or without a considerable loss of time." *Id.* We have previously equated the statutory term "immediate" with "impending" and "imminent." *See Millslagle v. State*, 81 S.W.3d 895, 898 (Tex. App.—Austin 2002, no pet.). And "imminent danger," we have observed, means that which is "'ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near.'" *Id.* (quoting *Elder v. State*, 993 S.W.2d 229, 230 (Tex. App.—San Antonio 1999, no pet.) (quoting *Devine v. State*, 786 S.W.2d 263, 270 (Tex. Crim. App. 1989))). We also noted that "imminent" danger requires more than "a situation that is potentially dangerous." *Id*. In sum, the Department relies on findings that (1) J.L. and K.M.'s sharing of a bedroom and (2) Barlow's "failure to immediately insist upon appropriate supervision" of K.M. gave rise to an actual, real risk of harm as a direct, temporally proximate result of (1) or (2).

As the acts of sharing a bedroom and failure to "insist upon appropriate supervision" do not inherently give rise to a risk of immediate harm, the relevant "harm" underlying Finding 18 must logically be K.M.'s sexualized behaviors. The Department's underlying findings concerning those behaviors are:

12.   In July and August 2001, K.M. was eight years old. He was sexually abused
      as a small child and had observed adults engaging in sexual behavior.

8

13.     By the time he was four years old, K.M. was emulating the sexual behavior to which he had been exposed. Since then he has had an extensive history of sexually acting out.

14.     At the time of the incident, K.M.'s sexual acting out had begun to improve; he had been caught sexually acting out only three or four times in the previous year.

While these findings suggest that K.M. could potentially perpetrate sexual acts on other children if he shared a bedroom with J.L. or if Barlow "fail[ed] to immediately insist upon appropriate supervision of K.M." at the time she learned of the sleeping arrangements, they alone fall short of identifying a substantial risk that K.M. would sexually perpetrate as an *immediate*, *direct* result of that situation. To the contrary, the Department found that "[a]t the time of the incident, K.M.'s sexual acting out had begun to improve," and that he "had been caught sexually acting out only three or four times in the previous year."

Barlow, other For Children's Sake personnel, and Department representative Penny Massengill did testify to the general understanding among caseworkers that K.M. continued to require continuous line-of-sight supervision when around younger children, and there was some evidence that he did pose a risk of "acting out" that is not fully reflected in the Department's findings.[6] Based on the record as a whole, whatever risk K.M. might have presented existed

---

[6] The evidence is disputed concerning the risk K.M. actually presented at the time of the incident. In April 2003, a judge had ordered K.M. to see a sex offender therapist weekly, and there is evidence that his foster parents had failed to meet that obligation and that the Barrons had not taken him to therapy at all. Yet in June 2003, the Department had downgraded K.M.'s level-of-care assessment, as determined by a third-party evaluation, from "Level 4" to "Level 3." As the ALJ explained,

whenever he was around younger children unsupervised, wherever that might be. The Department's representative, Penny Massengill, admitted that K.M. presented a risk in any room in the house, or even outside, if he was left unsupervised with younger children. Further, Massengill expressed strong doubts that K.M. could be entirely supervised, as a practical matter. Massengill observed that "[i]t is an impossibility to supervise a child 24 hours in a foster home" and said, "I think it was

---

Level 4 requires fairly extensive annual training of foster parents who care for children at this level . . . [and] "written plans for the direct, continuous observation of children who present a moderate risk of suicide or of physical injury to themselves or others." Level 3 provides, rather generally, that it be used for children who require a "higher level of supervision than children need at Level 2" and that all care givers receive support and direction from qualified individuals. Level 2 sets basic requirements for rules designed to improve the child's functioning in a family environment, with extra guidance and discipline to meet the child's needs.

Complicating our examination of the evidence is the ALJ's apparent reliance on evidence regarding K.M.'s behaviors that is contained in the Department's investigative file. The ALJ admitted this file into evidence for the limited purpose of establishing "the contents of the . . . file and for witnesses to refer to as appropriate," but explicitly ruled that "the contents, in and of themselves, are not admitted for the truth of the matters asserted." The PFD reflects that the ALJ cited evidence contained in the investigative file to establish the truth of certain assertions contained in the file regarding K.M's propensities.

Some of this evidence—but not all of it—was admitted without restriction through testimony and Barlow's own exhibits. This includes evidence of the general understanding among For Children's Sake personnel, including Barlow, that K.M. was not to be left unsupervised around younger children due to the risk that he would perpetrate on them. However, these witnesses did not elaborate on the temporal aspect of K.M.'s behavior. Although For Children's Sake caseworker Stephanie Rogers had stated in her testimony that K.M. would perpetrate "quickly" if left unsupervised, she admitted that she had no information that K.M. would in fact "quickly" perpetrate if left unsupervised, that she was relying on information that Barlow or others had told her, that she couldn't confirm that "quickly" was ever used to describe K.M.'s behavior.

As discussed below, there was also evidence of an incident in which Ms. Barron had caught K.M. kissing one of the four-year-olds on the mouth and had discovered that K.M. had occasionally woken up at night and crawled into one of the four-year-old's beds.

unreasonable for a professional to place foster parents in a situation where they had to allegedly supervise an eight-year-old child 24 hours." Given the risk she believed K.M. presented, Massengill opined, "I don't think the children should've been placed together, first of all." In fact, there is evidence that, following the incident, K.M. was placed in a home with older children, where he would not have any access to younger children.

Massengill and other witnesses also expressed concern with the children's placement in the Barron home in particular. For approximately four years preceding the incident, K.M., his brother J.M., and a sister had been placed in a foster home (the Davis foster home) that had been equipped with monitors or alarms that helped the Davises ensure that K.M. did not enter the rooms of other children while the Davises were asleep at night. The Barron home was not equipped with such devices. Other evidence indicated that For Children's Sake personnel had concerns about the Barrons' capabilities as foster parents, including the quality of their supervision of children. The ALJ appeared to credit this testimony, and further noted evidence that For Children's Sake had "counseled the Barrons and placed certain restrictions on their home." Stephanie Rogers, a For Children's Sake caseworker at the time of the incident, recounted, "My first concern was thinking that the children didn't need to be placed there at all, that it was a mistake to place high risk children with foster parents that we already had concerns about."

The record reflects that K.M., his two siblings, and the four-year-olds, J.L. and A.A., all came to be placed in the Barron home on an emergency, temporary respite basis beginning on July 18, 2001. All five children had been living in the Davis foster home. After K.M.'s sister made abuse allegations (later determined to be unfounded) against one of the Davises, the children were

11

required to be removed pending investigation of the allegations. The five children were placed in the Barron home because it was the only home with room available to accommodate all of the children. The children were kept together, rather than being placed in different homes, to preserve some stability amid the upheaval of being removed from their normal foster home.

It is undisputed that the decision to place K.M. and the other children in the Barron home was controlled by persons other than Ms. Barlow. Perhaps for this reason or others, the Department does not seek action against Barlow for the placement of the children together under the conditions present in the Barron home. We further observe that the Department made no findings, nor did the Department present evidence, concerning whether or how Barlow could have removed K.M. or other children from the Barron home and placed them elsewhere. Although Barlow had a "Level One" child-placing classification with legal authority to place children, *see* 40 Tex. Admin. Code § 720.36 (2003), the Department never elicited evidence that any relocation options were in fact available or that Barlow's For Children's Sake superiors would allow such a move. Again, it was Barlow's superiors—not her—that approved the placement of the children in the Barron home, and this decision was driven largely by the availability of space to house the children. The record, in short, is silent concerning the choices that Barlow had on August 2, and it was the Department's burden to prove that, in fact, Barlow had choices.[7]

---

[7] The ALJ recognized the importance of that question at the conclusion of the hearing:

Some sort of legal questions that occurred to me during the testimony today is . . . what was the authority of Ms. Barlow with respect to taking immediate action when she found out the children . . . were in the same room on August 2 and then, factually, really, . . . what alternatives should she have done at that point, what should have happened.

12

Instead, the Department relies on findings that Barlow failed to "remove" J.L. and K.M. from the "situation" of sharing a bedroom or to "immediately insist upon appropriate supervision of K.M.," and that it was these acts or omissions that "exposed" the children to the "substantial risk of immediate harm" presented by K.M.'s behaviors. Based on the record considered as a whole, there is not substantial evidence to support those findings.

Whatever risk K.M.'s unsupervised behavior presented was not unique to his location when around younger children, and it would have remained even if Barlow had compelled the Barrons to change the sleeping arrangements. As Massengill acknowledged, the risk presented by K.M.'s behaviors would have been present anywhere in the Barron home—or even outside it—if K.M. was left unattended with younger children. In fact, K.M. perpetrated on J.L. after Ms. Barron left K.M. and the other children unattended in the *kitchen*, during daytime. The Department made no findings explaining the singular significance that it accords to the fact that the children shared a bedroom.[8] In its PFD, the ALJ observed that the incident ultimately occurred in the shared bedroom and offers the brief, oblique comments that "the shared bedroom was also where the children's clothes and personal items were kept. It was where they dressed for the day, and it was presumably

The ALJ invited the parties to address that question in their written closing arguments. In that filing, the Department never responded to that invitation, other than to urge its arguments, addressed above, regarding the bedroom and whether Barlow instructed the Barrons to supervise K.M.

[8] Its underlying findings regarding the role of the bedroom were merely that:

15.    During their stay at the Barron home, K.M. shared a bedroom with the two four-year-olds.

16.    By August 2, 2001, [Barlow] was aware that K.M. was sharing a bedroom with the two four-year-olds, and she failed to separate them and to insist on more effective supervision of K.M.

13

a place to which they would naturally gravitate and feel at home. This appears to be what occurred the morning of August 3, 2001." This would seemingly be true of any room in the house where the children enjoyed spending time. Absent further findings regarding exactly how the children came to be in the bedroom at the time of the incident, there is not substantial evidence that the sleeping arrangements exposed the children to any risk not already present in K.M.'s placement in the Barron home.

As for Barlow's "failure to immediately insist upon appropriate supervision of K.M.," the ALJ credited testimony that the Barrons were aware of K.M.'s behaviors and that Barlow and other For Children's Sake personnel had warned them to supervise K.M. constantly when around younger children. Barlow testified that on the evening of July 18, 2001, when she moved the children to the Barron home for respite care, she admonished Ms. Barron that "she could not leave [K.M.] alone with the two four-year-olds." Stephanie Rogers testified that she had delivered clothes for the children later that evening and reiterated to Mr. Barron that due to K.M.'s history, he required constant supervision, could not be left alone with the four-year-olds, and would sexually act out with them if given the opportunity. Rogers recounted that Mr. Barron responded that he had kept K.M. many times for respite care and that he knew about K.M.'s behaviors. The Barrons' prior relationship and knowledge of K.M.'s behaviors was corroborated by evidence of correspondence from Ms. Davis, the regular foster mother, in which she stated that the Barrons had provided respite care for K.M. six or seven times over the last few years and that "they were aware of his behavior."

Ms. Barron testified; her husband did not. She professed never to have been given any particular warnings or instruction about K.M.'s behaviors and acknowledged only a vague

14

statement by Mr. Davis, K.M.'s regular foster father, to the effect that K.M. had unspecified "sexual issues." The ALJ, however, dismissed Ms. Barron's testimony as "confused and unpersuasive." Deferring to the fact-finder's assessment of the credibility and weight of the competing testimony regarding supervision, the record establishes that the Barrons were aware of and had experience with K.M.'s behaviors, and had been instructed by Barlow and others not to leave K.M. alone with the four-year-olds.

Massengill, who investigated the incident for the Department, explained that she had found Barlow to be a "designated perpetrator" of "neglect" based on her understanding that the Barrons had never been admonished about K.M.'s tendencies and to never leave him unsupervised with other children. She admitted that if anyone had told her "in a credible way" that the Barrons had been so admonished, they, and not Barlow, would have been found to be the designated perpetrators in the case. Thus, the Department's original basis for justifying its conclusion that Barlow was a "designated perpetrator" is not consistent with the evidence or facts as determined by the ALJ. At this juncture in the proceedings, the Department instead relies entirely on circumstances related to Barlow's August 2 visit to the Barron home to check on the status of the children. Barlow was accompanied by Shelley Church, a new caseworker with For Children's Sake. Barlow testified that this was the first time she had learned of the sleeping arrangements. The Department, as discussed, attributes great significance to the fact that the children were sharing a bedroom but also suggests that this revelation should have signaled to Barlow "an obvious lack of constant supervision."

15

Substantial evidence does not support a finding that Barlow failed "to immediately insist upon appropriate supervision of K.M." or that it was such a failure that directly and immediately resulted in a substantial risk that K.M. would sexually perpetrate on other children. Having previously admonished the Barrons regarding the need to supervise K.M. around other children, Barlow testified that she questioned Ms. Barron about the sleeping arrangements and obtained assurances that the four-year-olds went to sleep before K.M. went into the room, that K.M. went to sleep before Ms. Barron did, and that Ms. Barron would check on the children several times each night.[9] Consistent with her other "confused and unpersuasive" testimony, Ms. Barron claimed that Barlow said nothing about the sleeping arrangements. If, following this exchange, there remained a substantial risk that K.M. would perpetrate, it was one inherent in the placement itself, in the Barrons' supervisory abilities (as borne out by the events the following morning), in the physical limitation of the home, or in the sheer "impossibility" of constantly supervising K.M. in that environment. There is not substantial evidence that such a risk was an immediate, direct result of any act or omission by Ms. Barlow with respect to her being informed that the children were sharing a bedroom or reiterating to Ms. Barron that K.M. needed supervision.

We conclude that there is not substantial evidence to support the Department's finding of ultimate fact that it was Barlow's "failure to remove K.L. and J.L. from a situation in

---

[9] There was evidence that Barlow was told or had constructive knowledge of an incident four days earlier in which Ms. Barron had caught K.M. kissing one of the four-year-olds on the mouth. Ms. Barron also informed Barlow that she had discovered that K.M. had occasionally woken up at night and crawled into one of the four-year-old's beds, an act that Barlow interpreted as an innocent search for comfort amid the disruption of K.M.'s removal from the Davis home. While perhaps also going to the reasonableness of Barlow's actions, these facts are consistent with Ms. Barron in fact supervising the children and checking on them during the night.

16

which they shared a bedroom and her failure to immediately insist upon appropriate supervision of K.M [that] exposed these children to substantial risk of immediate harm." In turn, substantial evidence does not support its legal conclusion that "the Department proved by a preponderance of the evidence that [Barlow] neglected a child, as neglect is defined by Tex. Fam. Code Ann. § 261.001(4)," nor its ultimate order that Barlow's name should be placed on the central registry. As these issues are dispositive, we need not address whether Barlow acted reasonably[10] or whether she constituted a "person traditionally responsible for the care, custody, or welfare of a child" under section 261.001(5) of the family code.[11]

## CONCLUSION

As the ALJ observed, "[v]iewed in retrospect, the errors committed by numerous individuals in discharging their duties towards the children involved in this proceeding are both obvious and tragic." While Barlow may be among the numerous individuals whose acts or omissions in connection with this incident, in hindsight, may have adversely impacted the welfare of these children, we cannot conclude that the Department has met its burden to show that there is substantial evidence, based on this record as a whole, that her conduct constituted child neglect under section 261.001(4) of the family code. We accordingly overrule the Department's issues and affirm the judgment of the district court.

---

[10] The dissent focuses principally on this element. We do not, contrary to the dissent's statements, conclude that "Barlow acted diligently" or reasonably, *see Texas Dep't of Family & Protective Servs. v. Barlow*, No. 03-05-00469-CV, 2007 Tex. App. LEXIS _____, *3 (Tex. App.—Austin June 28, 2007, no pet. h.) (Patterson, J., dissenting), as we do not even reach that issue.

[11] We are grateful for the parties' post-submission briefing on this issue, however.

17

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop;
   Dissenting Opinion by Justice Patterson

Affirmed

Filed:   June 28, 2007